# EXHIBIT 2

# RELEVANT CASES

*Coulter-Owens v. Time, Inc.*,
**695 F. App'x 117 (6th Cir. 2017)**

695 Fed.Appx. 117
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Rose COULTER-OWENS, individually
and on behalf of others similarly situated,
Plaintiff-Appellant/Cross-Appellee,

v.

TIME INC., Defendant-Appellee/Cross-Appellant.

Nos. 16-1321 & 16-1380
|
Filed June 26, 2017

**Synopsis**

**Background:** Consumer brought putative class action against magazine publisher, alleging that publisher disclosed private information of people who subscribed to magazines through third-party websites in violation of Michigan's Preservation of Personal Privacy Act (PPPA), also referred to as the Video Rental Privacy Act (VRPA). The United States District Court for the Eastern District of Michigan, George Caram Steeh, District Judge, 2016 WL 612690, granted publisher's summary judgment motion. Consumer appealed, and publisher cross-appealed, challenging consumer's standing to sue.

**Holdings:** The Court of Appeals, Alice M. Batchelder, Circuit Judge, held that:

[1] consumer suffered injury-in-fact sufficient to confer Article III standing;

[2] amendment to PPPA requiring actual damages and repealing statutory damages provision is not retroactive; but

[3] consumer's purchase of subscription through independent third-party subscription agent was not a sale "at retail" within the meaning of PPPA.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (3)

**[1]** **Action** ⚏ Statutory rights of action

**Torts** ⚏ Persons entitled to sue

Michigan's Preservation of Personal Privacy Act (PPPA), also referred to as the Video Rental Privacy Act (VRPA), contained an express private right to sue, conferring statutory standing on a person whose information was disclosed in violation of PPPA, and thus consumer suffered injury-in-fact sufficient to confer Article III standing to bring invasion of privacy action against publisher regarding publisher's disclosure of consumer's reading preferences. U.S.C.A. Const. Art. 3, § 2, cl.1; Mich. Comp. Laws § 445.1712.

9 Cases that cite this headnote

**[2]** **Antitrust and Trade Regulation** ⚏ Retroactive operation

Amendment to Michigan's Preservation of Personal Privacy Act (PPPA), also referred to as the Video Rental Privacy Act (VRPA), requiring actual damages and repealing statutory damages provision is not actually remedial and is not retroactive; new PPPA does not contain any express statement of intended retroactivity, it contains a future effective date, given the extensive substantive changes, such as excising the statutory damages provision, it cannot be viewed as merely a clarifying amendment intended for retroactive application, and the amendment eliminates vested rights, such as the right to sue for statutory damages. Mich. Comp. Laws § 445.1712.

6 Cases that cite this headnote

**[3]** **Antitrust and Trade Regulation** ⚏ Consumers, purchasers, and buyers; consumer transactions

Consumer's purchase of publisher's magazine subscription through independent third-party

subscription agent was not a sale "at retail" within the meaning of Michigan's Preservation of Personal Privacy Act (PPPA), also referred to as the Video Rental Privacy Act (VRPA); there was no retailer-customer relationship between consumer and publisher, consumer went to a subscription agent's website, ordered subscription, paid for it with a credit card, subscription agent confirmed order, paid any applicable sales tax to government, sent order information to publisher with instruction to fulfill order, and publisher received order from subscription agent and filled it, using order information that subscription agent had provided. Mich. Comp. Laws Ann. § 445.1712.

3 Cases that cite this headnote

**\*118  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN**

**Attorneys and Law Firms**

Ryan D. Andrews, Roger Perlstadt, Edelson, Chicago, IL, for Plaintiff-Appellant Cross-Appellee

Jeffrey G. Landis, Marc J. Zwillinger, Zwillgen, Washington, DC, Lara Fetsco Phillip, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Defendant-Appellee Cross-Appellant

Before:  SUHRHEINRICH,  BATCHELDER,  and STRANCH, Circuit Judges.

**Opinion**

ALICE M. BATCHELDER, Circuit Judge.

In this diversity action alleging that disclosure of certain private information was in violation of state law, the plaintiff class representative appeals the summary judgment for the defendant and the defendant challenges the plaintiff's standing to sue. We find that the plaintiff does have standing and AFFIRM.

**I.**

Time Inc. ("Time") publishes and sells magazines. One way that it sells magazines is through third-party subscription agents: a customer places an order and pays the subscription agent; the subscription agent forwards the order information to Time and pays Time some discounted or lower amount (i.e., the agent retains some profit); and Time fulfills the order by mailing the magazine directly to the customer for the duration of the subscription period. The agent never takes physical possession of the magazines. The contracts between Time and the subscription agents are titled "Resale Agreements." The price the subscription agent pays to Time and the profit it makes on the sale are unique to—often different for—each agreement. The subscription agent collects payment from the customer and remits taxes on the sale, if applicable; the agent does not provide Time with credit card or other payment information. And the subscription agent (not Time) addresses and resolves customer-billing or delivery complaints.

Obviously, Time uses the "order information" (customer's name, address, and magazine choice) to fulfill the orders, but Time also sends that information to two other companies: Acxiom Corporation and Wiland Direct. Time does so to facilitate its "list rental business": Time sells ("rents") its subscriber lists to other enterprises (e.g., companies, political groups, charities) who want to target their own marketing to readers of specific magazines. As alleged here, Acxiom is a "vast marketing or data mining database" that enhances Time's subscriber lists with personal or demographic information obtained elsewhere, which enables Time to narrow its lists into focused, and therefore more valuable, subsets. And Wiland is a "marketing intelligence company" that shares its massive consumer database, which is valuable to Time's own marketing endeavors. Time does not seek or obtain customer consent before sharing this order information, but does provide notice of this practice  **\*119**  in its magazines and allows the subscribers to "opt out."

Rose Coulter-Owens represents a class of customers who purchased certain of Time's magazines (*Time*, *Fortune*, and *Real Simple*) through online subscription agents.[1] Specifically, Coulter-Owens paid $2 for a one-year weekly subscription of presumably 52 issues. (This price was not per issue, but $2 total for the entire year, of which the subscription agent did not pay any of the $2 to Time, so Time received no reimbursement for the magazine it was sending to Coulter-Owens for an entire year.) Time shared the order information with Acxiom and Wiland without Coulter-Owens's prior consent. Coulter-Owens sued in federal court, claiming an invasion of privacy in violation of Michigan's

Preservation of Personal Privacy Act (PPPA), [2] which has three provisions pertinent here. First, Section 2:

> Except as provided in section 3 or as otherwise provided by law, a person, or an employee or agent of the person, engaged in the business of selling at retail ... written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

Mich. Comp. Laws § 445.1712, Sec. 2 (effective 3/9/89 until 7/31/16, when amended) (footnote omitted).

Section 3 provides the enumerated exceptions:

A record or information described in section 2 may be disclosed only in 1 or more of the following circumstances:

(a) With the written permission of the customer.

(b) Pursuant to a court order.

(c) To the extent reasonably necessary to collect payment for the materials or the rental of the materials, if the customer has received written notice that the payment is due and has failed to pay or arrange for payment within a reasonable time after notice.

(d) If the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer. The person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information.

(e) Pursuant to a search warrant issued by a state or federal court or grand jury subpoena.

Mich. Comp. Laws § 445.1713, Sec. 3 (effective 3/9/89 until 7/31/16, when amended) (footnote omitted).

Finally, Section 5, the $5,000-per-incident statutory damages provision (since repealed):

> Regardless of any criminal prosecution for a violation of this act, a person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act. The customer may bring a civil action against the person and may recover both of the following:
>
> **\*120** (a) Actual damages, including damages for emotional distress, or $5,000.00, whichever is greater.
>
> (b) Costs and reasonable attorney fees.

Mich. Comp. Laws § 445.1715, Sec. 5 (effective 11/7/89 until 7/31/16, when amended). Coulter-Owens and the rest of the class of approximately 40,000 subscribers disclaimed any "actual damages" and instead sought $5,000 each (about $220 million total) in statutory damages.

Just to be clear before moving on, Coulter-Owens is not complaining about Time's selling her information under its "list rental business," which would fall within the "direct marketing exception" of § 1713(d). Coulter-Owens is suing Time for submitting this order information (name, address, and magazine choice) into Acxiom's and Wiland's giant stew of personal information already in their possession, such as her gender, race, age, education, employment, political affiliation, hobbies, etc., furthering a larger dossier on her. For example, Time submits her name, current address, and that she just subscribed to Time magazine, and gets back (hypothetically) a dossier of her age, gender, race, education level, employment history, or other hobbies and interests. With this information, Time places her on a specific list that it can sell to a business, charity, or political group interested in people with her same interests. It is this disclosure of her magazine-subscription information that she claims violates the PPPA.

In moving for summary judgment, Time argued, among other things, that it had not sold magazines to the plaintiff class members "at retail" as required by the PPPA. The district court agreed, finding that the subscription agents were "resellers" not "middlemen" so the sale was not a direct plaintiff-to-defendant sale, and granted summary judgment to Time on this basis. 🚩 *Coulter-Owens v. Time, Inc.*, No. 12-cv-14390, 2016 WL 612690, at \*3-4 (E.D. Mich. Feb. 16, 2016). Coulter-Owens appeals. Time cross-appeals, arguing that Coulter-Owens lacks standing, a claim that Time did not raise in the district court. [3]

## II.

 **[1]**   Despite Time's raising this jurisdictional claim for the first time on appeal—as a cross-appeal claim in answer to Coulter-Owens direct appeal—we address it first because "[s]tanding is a threshold question in every federal case." *Miller v. City of Wickliffe*, 852 F.3d 497, 502 (6th Cir. 2017). "[W]e review jurisdictional challenges based on standing de novo." *Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016).

Time contends that Coulter-Owens lacks Article III standing because she cannot prove injury in fact for one of two reasons: (1) *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), applies here to dictate that a mere violation of the PPPA is insufficient to establish injury in fact; or (2) Michigan's 2016 *curative* or *remedial* amendment to the PPPA is retroactive and requires proof of actual damages, which Coulter-Owens is not claiming. Coulter-Owens responds that she does have an injury (and standing) because the PPPA gives her a legally protected interest in the privacy of her reading choices, which Time violated by disclosing that information to third parties. She contends that the Supreme Court's decision in *Spokeo* does not affect this case because it is not on point, and the Michigan legislature's **\*121** amendments to the PPPA do not apply because they are not retroactive.

Since the district court's decision, however, three district court cases have addressed this question and found that a plaintiff does have standing under the PPPA, that *Spokeo* does not change that, and that the new PPPA is not retroactive: *Perlin v. Time Inc.*, No. 16-10635, 237 F.Supp.3d 623, 627–29, 2017 WL 605291, at \*2-3 (E.D. Mich. Feb. 15, 2017); *Moeller v. Am. Media, Inc.*, No. 16-cv-11367, 235 F.Supp.3d 868, 873–75, 2017 WL 416430, at \*3-4 (E.D. Mich. Jan. 27, 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F.Supp.3d 427, 437 (S.D.N.Y. 2016). Each of these opinions is thorough and persuasive. In short, given that the PPPA contains an express private right to sue, it confers statutory standing on a person whose information was disclosed in violation of it. Moreover, the disclosure of that information is a cognizable injury in fact for purposes of Article III standing.

 **[2]**   Here, Time argues that there is no injury because the Michigan legislature has amended the PPPA to require

actual damages (repealing the $5,000-per-incident statutory damages provision) and contends that the amendment is retroactive. But under Michigan law, a statute is presumed to operate prospectively unless there is a clear manifestation of contrary intent. *Frank W. Lynch & Co. v. Flex Techs., Inc.*, 463 Mich. 578, 624 N.W.2d 180, 182 (2001). In looking for intent, courts do not find retroactivity simply because a statute relates to an antecedent event, and may not find retroactivity if the new law takes or impairs vested rights under existing laws; but courts will find retroactivity from express language in the statute giving retroactive application, and may find retroactivity for a remedial or procedural act not affecting vested rights. *LaFontaine Saline, Inc. v. Chrysler Grp., LLC*, 496 Mich. 26, 852 N.W.2d 78, 85-86 (2014). The new PPPA does not contain any express statement of intended retroactivity (in fact, it contains a future "effective date"); and given the extensive substantive changes (such as excising the statutory damages provision) it cannot be viewed as merely a "clarifying" amendment intended for retroactive application. In this same way, the amendment eliminates vested rights, such as the right to sue for statutory damages. Consequently, the amendment is not actually remedial and is not retroactive.

Time also argues that the Supreme Court's recent decision in *Spokeo* dictates that the type of PPPA violation alleged here is now insufficient to constitute an injury in fact. In its simplest sense, *Spokeo*, 136 S.Ct. at 1549, held that "a bare procedural violation" of a statute, "divorced from any concrete harm," does not constitute an injury in fact. But the violation at issue here is not a "bare procedural violation"; it is a violation of the PPPA's most basic substantive protection, the privacy in one's reading materials. *Spokeo* does not apply here.

Coulter-Owens and the certified class have standing.

## III.

We review the grant of summary judgment de novo, construing facts and inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,

842 F.3d 422, 426 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

 **[3]** Coulter-Owens contends that the district court erred by improperly deciding **\*122** for itself the disputed question of material fact of whether the online subscription agents were "resellers" rather than "middlemen," and further by reaching the wrong conclusion on that question. Time replies that the district court was correct that Coulter-Owens had raised no genuine issue of material fact to support her contention that Time had sold magazines to her and the class "at retail," because they purchased the magazines from independent third-parties and, consequently, there was no "retailer-customer relationship" between Coulter-Owens and Time.

In explaining why the purchases through the third-party subscription agents were not "at retail," as meant by the PPPA, the district court focused on the "retailer-customer relationship":

> [T]he statute forbids a person '*engaged* in the business of selling at retail ... written materials' to disclose a 'record or information concerning the purchase' if that disclosure is 'to any other person, *other than the customer*.' Mich. Comp. Laws § 445.1712 (emphasis added).... When reading the term 'at retail' in the context of the entire statute, it is evident that purchases by third-parties do not fall within the statute's reach. The statute permits disclosure of a 'record or information concerning the purchase' if that disclosure is to the 'customer.' ... [T]he statute contemplates a relationship created when there is a sale 'at retail'—*i.e.*, selling goods for use not for *resale*—to a 'customer'—*i.e.*, the person purchasing the magazine from the seller. In this case, the sale was not between defendant (the retailer) and plaintiff/the proposed class members (the customer). Rather, it was a sale from the retailer to a reseller, then to the plaintiff/proposed class members. Therefore, it was not a sale 'at retail' as contemplated by the [PP]PA.

Th[is] interpretation also makes sense when reading Section 2 of the [PP]PA in context with Section 3. Section 3 of the [PP]PA provides certain exceptions or 'allowable circumstances' of a disclosure of the customer's 'record or information.' Mich. Comp. Laws § 445.1713. For example, one allowable circumstance for disclosure is when the customer consents in writing to the disclosure. *Id.* at § 445.1712(a). For a 'customer' to consent in writing to the disclosure, the statute contemplates a retailer-customer

relationship. Here, that relationship is not between plaintiff and defendant, it is between plaintiff and the third-party reseller.

*Coulter-Owens*, 2016 WL 612690, at \*3-4.

Coulter-Owens argues that the subscription agents were "middlemen" (not "resellers"), so Time sold to her "at retail," and cites two Michigan cases to support her distinction between "middlemen" and "resellers." In the first case, *World Book, Inc. v. Department of Treasury*, 459 Mich. 403, 590 N.W.2d 293 (1999), door-to-door encyclopedias salesmen who took orders and collected money on behalf of a publisher who then mailed the encyclopedias directly, were "middlemen." In the second case, *Michigan National Bank v. Department of Treasury*, 127 Mich.App. 646, 339 N.W.2d 515 (1983), a bank that facilitated the purchase of Krugerrands for a customer by negotiating a price with a coin dealer and, upon agreement by the customer, obtaining the Krugerrands from the dealer before providing them to the customer at the negotiated price plus commission, was a "reseller." According to Coulter-Owens, the intermediary is a "reseller" (and itself engaged in sale "at retail") only if it takes physical possession of the goods being sold. She points to the deposition of Time's Vice President of Marketing in which he agreed that the subscription agents did not **\*123** take possession of any magazines or pre-purchase some amount of subscriptions in order to re-sell them; they merely sold orders to be filled directly by Time. From this, Coulter-Owens says that a jury could find that the subscription agents were merely "middlemen" and thus it was Time that was selling "at retail."

Time glosses over the middleman/reseller distinction and contends that *World Book* and *Michigan National Bank* are inapposite, citing cases that found a third-party to be a reseller even without taking physical possession. *See Louisville/Jefferson Cty. Metro Gov't v. Hotels.com*, 590 F.3d 381, 389 (6th Cir. 2009) (finding Hotels.com a "reseller" though it remitted payment to the hotel from the customer). Time takes a different view altogether and insists that, "[t]o be a retailer, the entity must interact with the customer at the time of purchase"—which Coulter-Owens admits did not happen.

Before resolving this "at retail" dispute, however, we can dispose of Coulter-Owens's claim that summary judgment was improper because the question of whether the subscription agents were "middlemen" or "resellers" was a

question of material fact for a jury. It was not. There is no dispute about how the transaction occurred: Coulter-Owens went to a subscription agent's website (e.g., Magazines.com), ordered a magazine subscription, and paid for it with a credit card; the subscription agent confirmed the order with Coulter-Owens, paid any applicable sales tax to the government, and sent Coulter-Owens's order information to Time with instruction to fulfill the order; Time received the order from the subscription agent and filled it, using the order information that the subscription agent had provided. The remaining question was a legal one: given these facts, is the subscription agent a "middleman" or a "reseller," as the law defines it? There was no disputed fact for a jury to decide based on witness testimony, competing evidence, expert opinion, etc. This was a proper issue for summary judgment.

But the real question (the purely legal question) is whether the sale was "at retail," as the law defines it, and we agree with Time that the middleman/reseller distinction is not dispositive. The question, instead, is what "at retail" meant in the PPPA, Mich. Comp. Laws § 445.1712, Sec. 2 (effective 3/9/89 until 7/31/16). One might find it odd to think that the Michigan legislature intended to penalize the disclosure of this information by the subscription agents but not by the publisher (Time), even though (1) the subscription agent would have to disclose this information to Time to fulfill the order and (2) the PPPA would prevent the disclosure by Time if Time sold the same subscription directly from its own website. It is perhaps likely that the legislature intended to regulate any company that sells to the public (as Time does). But because the statute specifically includes the phrase "at retail," it necessarily excludes nonretail sales (and nonretail sellers). Some types of sale, and sellers, are nonretail and it is not unreasonable to conclude that the intermediary subscription agent as used in this case renders Time a nonretail seller.

> Whatever nonretail sellers are, it is possible that the PPPA could have further advanced Michigan's aims by reaching them, but 'a State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns.' As it stands, the law restricts those most likely to have protected information.

*Boelter v. Advance Magazine Publishers Inc.*, 210 F.Supp.3d 579, 600-01 (S.D.N.Y. 2016) (quoting *Williams-Yulee v. Fla. Bar*, —— U.S. ——, 135 S.Ct. 1656, 1668, 191 L.Ed.2d 570 (2015)).

**\*124**  The PPPA includes the phrase "at retail." That phrase has to mean something and at a minimum it means that some types of sales must be "nonretail," which are consequently excluded. There were two sales here: Time's sale to the subscription agent and the subscription agent's sale to Coulter-Owens. Because Coulter-Owens is the end consumer, the sale to her was necessarily "at retail"; the sale from Time to the subscription agent here was not "at retail" under the facts of this case. The district court was correct that the PPPA does not govern this sale.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

695 Fed.Appx. 117, 45 Media L. Rep. 2149

## Footnotes

1    The certified class comprises "[a]ll Michigan residents who between March 31, 2009 and November 15, 2013 purchased a subscription to *TIME*, *Fortune*, or *Real Simple* magazines through any website other than Time.com, Fortune.com, and RealSimple.com." R. 117.

2    The district court and Time refer to this statute as the VRPA, i.e., "Video Rental Privacy Act."

3    Time also challenges the district court's certification of the class. Because of our determination of Coulter-Owens's direct appeal, however, we need not address this class-certification issue on appeal.

**Coulter-Owens v. Time Inc., 695 Fed.Appx. 117 (2017)**

45 Media L. Rep. 2149

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

*Dabish v. McMahon*,
818 F. App'x 423 (6th Cir. 2020)

818 Fed.Appx. 423
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Danial Khaled DABISH; Brian Abrou; Livernois
Ventures, Incorporated, Plaintiffs-Appellants,

v.

James MCMAHON, Detective, in his individual
and official capacity; Michael Stout, Detective,
in his individual and official capacity; City of
Hamtramck, MI; City of Highland Park, MI; B&G
Towing Company; Anthony Thomas; Gasper
Fiore; Michael Lucas, Defendants-Appellees.

No. 19-1941
|
FILED June 19, 2020

**Synopsis**
**Background:** Automobile body shop managers, whose
homes were raided as part of a multi-jurisdictional auto
theft task force, brought § 1983 and § 1985 action against
police officers, cities, and towing companies, arising out
of their conduct during and after the raid, and asserted
Michigan state law claims of ethnic intimidation, gross
negligence, abuse of process, and false imprisonment against
the officers, and claims of concert of action, civil conspiracy,
statutory conversion, and common law conversion against
all defendants. The United States District Court for the
Eastern District of Michigan, Gershwin A. Drain, J., 2019
WL 3288931, granted defendants' various motions to dismiss.
Managers appealed.

**Holdings:** The Court of Appeals, Stranch, Circuit Judge, held
that:

[1] managers' section 1983 and 1985 claims accrued when
their homes were raided;

[2] managers' Michigan state law claims accrued when their
homes were raided;

[3] under Michigan law, tolling agreement allegedly executed
as part of prior settlement was invalid; and

[4] under Michigan law, fraudulent concealment doctrine
could not toll managers' claims against towing companies.

Affirmed.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (5)

[1] **Limitation of Actions** ⚷ Civil rights
Section 1983 and 1985 claims asserted by
automobile body shop managers, whose homes
were raided as part of a multi-jurisdictional
auto theft task force, against police officers,
cities, and towing companies, accrued, and three-
year statute of limitations began to run, when
their homes were raided and their vehicles were
towed and impounded. 42 U.S.C.A. §§ 1983,
1985.

[2] **Limitation of Actions** ⚷ Torts
**Limitation of Actions** ⚷ Civil rights
Michigan state law claims, asserted by
automobile body shop managers, whose homes
were raided as part of a multi-jurisdictional
auto theft task force, for ethnic intimidation,
gross negligence, abuse of process, and false
imprisonment against police officers, and
concert of action, civil conspiracy, statutory
conversion, and common law conversion against
officers, cities, and towing companies, accrued,
and three-year statute of limitations period began
to run, when their homes were raided and their
vehicles were towed and impounded. Mich.
Comp. Laws Ann. §§ 600.5805(3), 750.147b.

1 Cases that cite this headnote

**[3]**   **Compromise, Settlement, and Release** 👤 Nonparties in general

Under Michigan law, tolling agreement allegedly executed as part of a prior settlement agreement executed by automobile body shop managers in action against police officers and cities for civil rights violations and violations of Michigan law, in connection with raid of their homes, conducted as part of a multi-jurisdictional auto theft task force, did not cover towing companies named as defendants in managers' subsequent action, where towing companies were not parties to the prior suit.

**[4]**   **Limitation of Actions** 👤 Agreements as to period of limitation

Under Michigan law, tolling agreement allegedly executed as part of prior settlement contained in e-mail messages between attorney for automobile body shop managers and defense attorney for police officers and cities, was invalid, and thus did not toll statute of limitations in managers' subsequent action against officers and cities for civil rights violations and violations of Michigan law; while defense attorney initiated e-mail exchange and managers' attorney responded with one-sentence e-mail requesting defense attorney to sign the tolling agreement, there was no additional e-mail or correspondence offering or accepting the terms of the agreement, no signature from defense attorney or any defendant, and no mention of tolling agreement in stipulated order of dismissal of prior case.

**[5]**   **Limitation of Actions** 👤 Concealment of Cause of Action

Under Michigan law, fraudulent concealment doctrine could not toll claims against towing companies, asserted by automobile body shop managers, whose homes were raided, and whose vehicles were towed and impounded, as part of multi-jurisdictional auto theft task force, since complaint did not allege that the towing companies engaged in fraudulent concealment of their involvement in the underlying conspiracy with police officers and cities, and made no

mention of the towing companies acting in secret.

**\*425**  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN OPINION

**Attorneys and Law Firms**

Steve Haney, Haney Law Group, PLLC, Southfield, MI, Muneeb M. Ahmad, Attorney, Ahmad & Akbar, Royal Oak, MI, for Plaintiffs - Appellants

Anthony K. Chubb, Giarmarco, Mullins & Horton, Troy, MI, for Defendants - Appellees James McMahon, City of Highland Park, MI

James P. Allen, Sr., James M. Surowiec, Assistant Corporation Counsel, Law Offices, Detroit, MI, for Defendants - Appellees Michael Stout, City of Hamtramck, MI

Nicholas James Bachand, Law Office, Detroit, MI, for Defendants - Appellees B&G Towing Company, Anthony Thomas, Michael Lucas

Gasper Fiore, Pro Se

BEFORE: BATCHELDER, STRANCH, and MURPHY, Circuit Judges.

**Opinion**

JANE B. STRANCH, Circuit Judge.

Michigan police officers Michael Stout and James McMahon executed a search warrant on an automobile collision repair business, Livernois Ventures, and the home of its shop manager, Danial Dabish, in 2014. They seized over a hundred vehicles, which were towed and impounded by B&G Towing Company. Plaintiffs sued the Officers, the Cities that employed them, and B&G towing and its principals, alleging federal and state civil rights claims and state tort claims based on the 2014 raid and the subsequent towing and impounding of the vehicles. Because the Plaintiffs' complaint was filed after the relevant statutes of limitations ran, we **AFFIRM** the district court's dismissal of all claims.

## I. BACKGROUND

Danial Dabish and Brian Abrou were automobile body shop managers for Livernois Ventures, a company that handled collision repair in Detroit. They allege that on or about September 10, 2014, Officers Stout and McMahon raided Livernois and Dabish's home as part of a multi-jurisdictional auto theft task force that involved officers from the City of Hamtramck and the City of Highland Park. They claim that the Officers fabricated probable cause to **\*426** obtain the search warrant based on racial animus against Arab Americans and Arab-American businesses. The Officers assert that the search was conducted based on allegations of Dabish's involvement in fraudulent insurance activities and racketeering. Approximately 110 vehicles were seized and were towed and impounded by B&G Towing Company and its principals Michael Lucas, Anthony Thomas, and Gasper Fiore ("Tow Defendants"). Plaintiffs allege that Lucas demanded hundreds of thousands of dollars in cash for the return of the vehicles, and at least some of them were never returned. They also allege that Abrou was falsely imprisoned for four days and threatened with physical abuse by the Officers.

On or around June 23, 2016, Dabish and Livernois filed a complaint against the Officers and the Cities, seeking damages arising from the same transactions and occurrences that serve as the basis for this case. As part of a monetary settlement of the 2016 case, the parties entered a stipulation of dismissal without prejudice. Plaintiffs claim that the parties entered a tolling agreement as part of the 2016 case settlement that tolled the statute of limitations for their claims until October 1, 2018.

Plaintiffs point to a copy of a tolling agreement in the record that contains the signature of the Plaintiffs' attorney, Steve Haney, but no signatures of any of the defendants or their attorney, John Clark. They also claim that an e-mail chain shows that John Clark drafted the tolling agreement and wanted to sign and execute it. In particular, one e-mail from John Clark to Steve Haney contained the proposed tolling agreement as an attachment along with the message, "Steve-resending the tolling agreement. Please sign so we can put this one to bed." There were no other relevant e-mail messages or communications in the record, and no signature from any of the defendants or John Clark on a tolling agreement anywhere in the record. The stipulated order of dismissal filed with the district court did not reference any tolling agreement.

In August 2018, Gasper Fiore was convicted in federal court of bribery relating to the towing contracts. On August 9, 2018, Plaintiffs filed a ten-count complaint alleging claims under 🚩 42 U.S.C. § 1983 and 🚩 § 1985 based on the actions of the Officers, the Cities, and the Tow Defendants during and after the September 10, 2014 raid. They also allege Michigan state law claims of ethnic intimidation, gross negligence, abuse of process, and false imprisonment against the Officers, and claims of concert of action, civil conspiracy, statutory conversion, and common law conversion against all Defendants. Plaintiffs assert that it was not until August 2018 that they became aware of the plot of the Tow Defendants to keep secret their participation in the plan to enrich all Defendants.

Defendants filed several motions to dismiss arguing that Plaintiffs' claims in this 2018 case are barred by the applicable statutes of limitations. Dabish subsequently pled guilty in federal court to one count of mail fraud, acknowledging in his plea agreement that he "knowingly participated in a scheme to defraud in order to obtain money ... from the payment of false claims to insurance companies." Officer Stout and the City of Hamtramck filed a second motion to dismiss arguing that Dabish's claims must be dismissed because he pled guilty to the same (or similar) crime that had established probable cause for the search in 2014. Officer McMahon and the City of Highland Park also filed a motion for summary judgment based on similar arguments.

The district court granted the various **\*427** motions to dismiss. [1] The court first found that the statutes of limitations barred the claims against all Defendants because this 2018 complaint was filed over three years after the events in 2014, and no valid tolling agreement was entered in the prior 2016 action. It considered other arguments raised by Defendants and determined that Plaintiffs' claims were barred pursuant to 🚩 *Heck v. Humphrey*, 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and the doctrine of collateral estoppel due to Dabish's criminal conviction. It then held that Plaintiffs failed to state a claim of *Monell* liability against the City of Hamtramck, and that the claims against Officer Stout and the City of Hamtramck fail on the grounds of qualified immunity and governmental immunity. Plaintiffs now appeal.

## II. ANALYSIS

We review the district court's order granting Defendants' motions to dismiss de novo. 🚩 *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc) (citing *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012)). Plaintiffs' federal claims are subject to three-year statutes of limitations. *See* 🚩 *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) ("the appropriate statute of limitations to be borrowed for 🚩 § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims."); *Ziegler v. State of Michigan*, 230 F.3d 1361 (6th Cir. 2000) (noting that the statute of limitations for 🚩 § 1983 and 🚩 § 1985 claims is three years). Plaintiffs' state claims are all likewise subject to three-year statutes of limitations. *See* 🚩 M.C.L. 750.147b (ethnic intimidation); *Bellamy v. Target Stores*, No. 235334, 2002 WL 31934019, at *2 (Mich. Ct. App. Nov. 19, 2002) (gross negligence); *Lechner v. Peppler*, No. 337872, 2018 WL 2121483, at *1 (Mich. Ct. App. May 8, 2018) (abuse of process); *Akers v. Bankers Life & Casualty Co.*, No. 283771, 2009 WL 1767617, at * 2 (Mich. Ct. App. June 23, 2009) (concert of action); *Mays v. Three Rivers Rubber Corp.*, 135 Mich.App. 42, 352 N.W.2d 339, 340 (1984) (civil conspiracy); *Tillman v. Great Lakes Truck Ctr., Inc.*, 277 Mich.App. 47, 742 N.W.2d 622, 623 (2007) (statutory conversion; common law conversion); 🚩 M.C.L. 600.5805(3) (false imprisonment).

**[1]** **[2]** We have held that dismissal of a complaint is warranted if "the allegations in the complaint affirmatively show that the claim is time-barred." 🚩 *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting 🚩 *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)); *see also* 🚩 *Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("If the allegations ... show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim."). Because the facts that underlie Plaintiffs' complaint here—the raid on September 10, 2014 and the subsequent towing and impounding of the vehicles—took place more than three years before the August 9, 2018 filing of the complaint in this case, the claims are untimely.

**[3]** **[4]** Plaintiffs do not dispute that the accrual date for their federal and state claims would be on or around September 10, 2014, but they rely on the alleged tolling agreement from

the settlement of the 2016 case that, if valid, would extend the statute of limitations on Plaintiffs' claims to October 1, 2018. As a preliminary matter, the Tow Defendants were not parties to the prior suit, and any tolling agreement **\*428** would not cover them. Under Michigan law, the existence of a settlement agreement is governed by the legal principles of contract construction, requiring mutual assent or a meeting of the minds on all the essential terms. *See* 🚩 *Kloian v. Domino's Pizza L.L.C.*, 273 Mich.App. 449, 733 N.W.2d 766, 770 (2006); 🚩 *Burkhardt v. Bailey*, 260 Mich.App. 636, 680 N.W.2d 453, 463 (2004). While the defense attorney appears to have initiated the e-mail to the Plaintiffs' attorney to execute the tolling agreement, the only evidence of any intent to be bound by the agreement is the one-sentence e-mail: "Steve-resending the tolling agreement. Please sign so we can put this one to bed." There is no additional e-mail evidence or correspondence offering or accepting terms of the agreement, no signature from the defense attorney or any defendant, and no mention of a tolling agreement in the stipulated order of dismissal of the 2016 case.

To support their argument, Plaintiffs cite to 🚩 *Kloian v. Domino's Pizza L.L.C.*, in which the parties' attorneys exchanged e-mails with language that the Michigan Court of Appeals determined to constitute a valid settlement. 733 N.W.2d at 770–71. The court found that counsel's e-mail stating that the plaintiff would accept a specific payment amount in exchange for the dismissal of the claims constituted a valid offer and a contract was created once defense counsel e-mailed back that the defendant "accepts your settlement offer." 🚩 *Id.* The one line in the e-mail here is easily distinguishable from the facts of 🚩 *Kloian*; the request to sign a proposed tolling agreement does not constitute mutual assent to the terms of the tolling agreement. The district court correctly determined that no tolling agreement exists between the parties. It did not err in dismissing the claims against the Officers and the Cities as they were filed beyond the statute of limitations.

**[5]** Plaintiffs also argue that the statutes of limitations have not run on their claims against the Tow Defendants because they fraudulently concealed and kept secret their concerted activities with the Officers and Cities, thus preventing Plaintiffs from discovering the Tow Defendants' improper actions until Fiore was convicted of bribery in August 2018. A tort claim accrues for the purposes of the statute of limitations under Michigan law when the elements of the cause of

action have occurred and can be alleged in a complaint—at the point "where plaintiff knows or should have known of [the tortious act]." *Williams v. Polgar*, 391 Mich. 6, 215 N.W.2d 149, 158 (1974). All claims against the various defendants here are based on the initial raid, towing, and impounding of the vehicles in 2014. And when plaintiffs seek to use the fraudulent concealment doctrine to toll the statute of limitations, we have held that they must sufficiently plead that response to the statute-of-limitations defense in their complaint. *See Lutz*, 717 F.3d at 475; *Evans v. Pearson Enters.*, 434 F.3d 839, 850–51 (6th Cir. 2006). The complaint, however, does not allege that the Tow Defendants engaged in fraudulent concealment of their involvement in the underlying conspiracy and makes no mention of the Tow Defendants acting in secret. Plaintiffs' argument regarding fraudulent concealment is without merit.

Because the district court correctly dismissed all claims based on the statutes of limitations, there is no need to address the other grounds that the district court considered in its order.

### III. CONCLUSION

Because the statutes of limitations had run when Plaintiffs filed their complaint in *429 2018, we **AFFIRM** the district court's dismissal of all claims.

**All Citations**

818 Fed.Appx. 423

## Footnotes

1    The order also dismissed the action against McMahon and the City of Highland Park, which terminated their motion for summary judgment.

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Wheaton v. Apple, Inc.*,
No. C 19-02883, 2019 WL 5536214
(N.D. Cal. Oct. 25, 2019)

Case 4:22-cv-11107-FKB-DRG ECF No. 15-3, PageID.621 Filed 09/19/22 Page 18 of 22

Wheaton v. Apple Inc., Not Reported in Fed. Supp. (2019)

2019 WL 5536214
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Leigh WHEATON; Jill Paul; and Trevor
Paul, individually and on behalf of all
others similarly situated, Plaintiffs,
v.
APPLE INC., Defendant.

No. C 19-02883 WHA
|
Signed 10/24/2019
|
Filed 10/25/2019

**Attorneys and Law Firms**

L. Timothy Fisher, Blair E. Reed, Bursor & Fisher, P.A., Walnut Creek, CA, David William Hall, Hedin Hall LLP, San Francisco, CA, Joseph I. Marchese, Philip Lawrence Fraietta, Bursor Fisher P.A., New York, NY, Robert Ahdoot, Theodore Walter Maya, Ahdoot & Wolfson, P.C., Los Angeles, CA, Frank S. Hedin, Hedin Hall LLP, Miami, FL, for Plaintiffs.

Emily Johnson Henn, Covington & Burling LLP, Palo Alto, CA, Simon J. Frankel, Ethan Clark Forrest, Sarah Jean Guerrero, Covington & Burling LLP, San Francisco, CA, for Defendant.

### ORDER GRANTING MOTION TO DISMISS

William Alsup, United States District Judge

### INTRODUCTION

 **\*1** In this putative class action, plaintiffs bring claims under Rhode Island and Michigan law for selling, renting, transmitting, or disclosing a customer's information without consent. Defendant moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This order **GRANTS** defendant's motion to dismiss.

### STATEMENT

Defendant Apple Inc. is a Delaware corporation with its principal place of business in Cupertino, California. One of Apple's services is selling and distributing digital music via its iTunes Store mobile application. The iTunes Store application comes pre-installed on customers' iPhones. An Apple customer can purchase music from the iTunes store. The music is then stored in their device's Apple Music libraries. A customer's personal listening information, found in their Apple Music libraries, includes their full name and home address along with genres and in some cases, the specific music titles they purchased (Compl. ¶¶ 3, 16).

Plaintiff Leigh Wheaton is a citizen and resident of Rhode Island. Plaintiffs Jill Paul and Trevor Paul are citizens and residents of Michigan. Over the past three years, plaintiffs all purchased music from Apple via its iTunes Store. Plaintiffs allege that during this time, without their notice and consent, Apple sold, rented, transmitted, and disclosed their personal listening information to third parties. Plaintiffs allege that Apple disclosed this information to two groups: (1) data brokers, data appenders, data aggregators, data miners, and other third parties, who then supplemented the personal listening information with additional sensitive personal information such as, age, gender, education, household income, purchasing habits; and (2) iOS mobile application developers, who in turn sold and disclosed the information to other third parties.

The complaint categorizes the purported disclosures to iOS mobile application developers into three methods: (1) developers access to metadata; (2) tokens; and (3) gifting functionality. Under the first method, plaintiffs allege developers could extract customers' iTunes music libraries metadata and link customers' individual identities to the data. Under the second method, plaintiffs contend Apple allowed developers to readily access customers' "tokens," which could be associated with personally identifying information. Under the third method, plaintiffs argue that Apple disclosed personal listening information to other customers. Specifically, when a customer attempted to gift a song to another customer, iTunes would tell the purchaser if the recipient had already purchased the song, thereby revealing the recipient's name and earlier music selection (Compl. ¶¶ 45–83).

As a result of Apple's alleged failure to protect customers' private information, plaintiffs claim (1) overpayment; (2) loss of value of their personal listening information; (3) unwarranted junk mail and telephone solicitations; and (4) risk of identity theft (Compl. ¶¶ 44, 68, 117–19, 138–42).

Case 4:22-cv-11107-FKB-DRG  ECF No. 15-3, PageID.622  Filed 09/19/22  Page 19 of 22

*Wheaton v. Apple Inc., Not Reported in Fed. Supp. (2019)*

**\*2** Based on the allegations, plaintiffs bring three claims against Apple: (1) violation of Rhode Island's Video, Audio, and Publication Rentals Privacy Act; (2) violation of Michigan's Preservation of Personal Privacy Act; and (3) unjust enrichment (Compl. ¶¶ 98–154). Apple moves to dismiss this complaint in full. This order follows full briefing and oral argument (Dkt. Nos. 37, 50, 51).

### ANALYSIS

Apple moves to dismiss plaintiffs' complaint on the grounds that plaintiffs do not allege damages under the Michigan state law as recently amended, lack standing under Rule 12(b)(1), and fail to state their claims under Rule 12(b)(6).

### 1. STATE STATUTE APPLICATION.

Plaintiffs' complaint alleges violations of two state statutes: the Rhode Island Video, Audio, and Publication Rentals Privacy Act and the Michigan Preservation of Personal Privacy Act. RIVRPA states in pertinent part:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals with the titles or nature of video films, records, cassettes, or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products....

R.I. Gen. Laws § 11-18-32(a). In other words, for a defendant to be liable under RIVRPA, they must disclose a customer's record which identifies their name and address in connection with the titles of the content in question. Apple moves to dismiss plaintiffs' RIVRPA claim, but no dispute exists as to the application of RIVRPA.

The parties debate, however, whether the amended or unamended version of the MIPPPA applies. The unamended MIPPPA, effective November 7, 1989–July 30, 2016, stated:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.... [A] person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act. The customer may bring a civil action against the person and may recover both of the following: (a) Actual damages, including damages for emotional distress, or $5,000.00, whichever is greater. (b) Cost and reasonable attorney fees....

The amended MIPPPA, effective July 31, 2016, states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not knowingly disclose to any person, other than the customer, a record or information concerning the that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business.... [A] customer described in subsection (1) who suffers actual damages as a result of a violation of this act may bring a civil action against the person that violated this act and may recover both of the following: (a) The customer's actual damages, including damages

Case 4:22-cv-11107-FKB-DRG ECF No. 15-3, PageID.623 Filed 09/19/22 Page 20 of 22

*Wheaton v. Apple Inc.*, Not Reported in Fed. Supp. (2019)

for emotional distress. (b) Reasonable costs and attorney fees....

**\*3** M.C.L.A §§ 445.1712–445.1715. Three key differences exist between the versions: (1) the unamended version stated that a violation requires disclosure of material that "indicates the identity of the customer"; whereas, the amended version specifies that a violation requires disclosure of information that "personally identifies the customer"; (2) the amended version requires customers to first suffer actual damages before bringing a claim; and (3) the unamended version allowed a customer to recover actual damages, including damages for emotional distress, or $5,000.00, whichever was greater; whereas, the amended version limits recovery to actual damages.

This order holds that for all future litigation on this matter — under the current facts — the unamended MIPPPA governs because the statute does not apply retroactively and the date of the claim accrual determines the amendment's applicability. Apple cites to the legislative history in arguing that the amended version applies retroactively because the amendment is curative and intended to clarify the unamended version. The legislative history provides in pertinent part:

> The amendatory act is curative and intended to clarify that the prohibitions on disclosing information contained in [the unamended MIPPPA], do not prohibit disclosing information if it is incident to the ordinary course of business of the person disclosing the information ... and that a civil action for a violation of those prohibitions may only be brought by a customer who has suffered actual damages as a result of the violation.

S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016). The United States Court of Appeals for the Sixth Circuit, however, found that for MIPPPA to apply retroactively, the amended version must provide clear language of such legislative intent. The amended MIPPPA and the legislative history do not contain any express statement of intended retroactivity. Therefore, the amended MIPPPA does not apply

retroactively. *Coulter-Owens v. Time Inc.*, 695 F.App'x. 117, 121 (6th Cir. 2017).

Alternatively, Apple cites to *Raden v. Martha Stewart Living Omnimedia, Inc.*, 2017 WL 3085371, at \*4 (E.D. Mich. July 20, 2017) (Judge Linda Parker) to argue that even if MIPPPA does not apply retroactively, the amended version applies because the date of filing the complaint determines the amendment's applicability. This argument fails. Several other Michigan decisions have held that the date of accrual, rather than the date of filing the complaint, governs. *Horton v. Gamestop Corp.*, 380 F.Supp.3d 679, 683 (W.D. Mich. Sept. 28, 2018) (Judge Gordon Quist); 🔖 *Hill v. Gen. Motors Acceptance Corp.*, 207 Mich. App. 504, 513–14 (1994); *In re Certified Question from United States Court of Appeals for Ninth Circuit (Deacon v. Pandora Media, Inc.)*, 499 Mich. 477, 483 n.7 (2016). *Raden* was an outlier. In *Horton*, the district court found that the unamended version of the MIPPPA may be applied if the plaintiff accrued the claims prior to the effective date of the amendment regardless of the fact that the plaintiff filed the complaint nearly two years after the amendment took place. *Id.* at 682. The facts in *Horton* mirror the facts in this action. Plaintiffs filed their complaint years after the amended version was already in effect, but plaintiffs claim injury between May 24, 2016, and July 30, 2016 — before the amended MIPPPA took effect. Thus, the unamended MIPPPA applies.

**\*4** The complaint does not need to state actual damages before bringing claims against Apple under the unamended MIPPPA (though the Rule 26(a) initial disclosure must do so). Accordingly, this order will not address whether plaintiffs' damages are sufficient under Rule 12(b)(1) or Rule 12(b)(6).

### 2. APPLE'S MOTION TO DISMISS.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." 🔖 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. 🔖 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss, a court may generally consider only allegations in the pleadings, attached exhibits, and matters properly subject to judicial notice. For purposes of ruling on a motion to dismiss, all well-pled material allegations of the complaint are accepted as true and the complaint must be

construed in favor of the complaining party. 🚩 *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008). Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. 🚩 *Iqbal*, 556 U.S. at 681.

Plaintiffs use the term "personal listening information" throughout their complaint to refer to a customer's full name and address in connection with their music selection purchases. Neither RIVRPA nor MIPPPA uses the term. Plaintiffs' counsel, rather, invented the term for purposes of this case. RIVRPA only imposes liability on Apple if it discloses a customer's name and address with their music selection information. Under the unamended MIPPPA, to hold Apple liable, the information disclosed must indicate a customer's identity in connection with their music selection.

### A. Third-Party Data Brokers and Similar Entities.

The complaint fails to plausibly allege with enough facts that Apple disclosed plaintiffs' personal listening information to third-party data brokers and similar entities, which caused plaintiffs overpayment, loss of value in personal information, unwarranted junk mail, and risk of identity theft.

The complaint depends on the attached Exhibits C and D as facts to support plaintiffs' claim. None of it plausibly shows that Apple disclosed plaintiffs' personal listening information. For example, the complaint cites to Exhibit C to support the claim. The complaint alleges that Exhibit C is a listing by a third-party data broker selling customers' names, addresses, and personal listening information. Exhibit C does not provide sufficient facts to support this argument. Plaintiffs, in their opposition to Apple's motion, emphasize that the mail icon in the exhibit includes names and addresses. Yet, the mail icon does not explicitly disclose any names, addresses, or personally identifying information of customers. It is merely a picture of an envelope. The complaint fails to explain anything about clicking on the icon. Without more information, which was surely available to counsel, this order will not speculate that the mail icon explicitly would lead to Apple customers' names and addresses (Compl. ¶ 47; Compl. Exh. C).

**\*5** The complaint also cites to Exhibit D, which it alleges is a listing by another third-party data broker selling Apple customers' personal listening information (Compl. ¶ 50;

Compl. Exh. D). Exhibit D, however, does not sufficiently support plaintiffs' claim because the exhibit fails to mention the third-party data broker name, Apple, or even iTunes. Thus, the exhibit does not show that Apple disclosed customers' personal listening information. Apple's motion to dismiss as to the third-party data brokers under Rhode Island and Michigan law is **GRANTED**.

### B. IOS Mobile Application Developers.

The complaint also does not provide enough facts to plausibly show that Apple disclosed plaintiffs' identities in connection with their music selection information to iOS mobile application developers for any of the three methods: (1) metadata; (2) tokens; and (3) gifting.

*First*, the complaint alleges that Apple disclosed customers' personal listening information to developers through metadata. Plaintiffs attach Exhibits E, F, G, and H to the complaint to support the allegation. The problem is that under both RIVRPA and MIPPPA, a violation only occurs when a customer's music selection is disclosed in connection with their personally identifying information. Plaintiffs' exhibits supplementing the complaint do not purport to disclose such information. For example, Exhibits E and F show websites where a developer posted claims regarding Apple giving developers access to metadata for every song in a customer's library (Compl. Exhs. E, F). The exhibits, however, do not show that Apple disclosed customers' personally identifying information as required under RIVRPA and MIPPPA. Exhibit F provides, "[w]ith that one line of code, you can get the full metadata for every song in a user's library without them ever knowing," but the exhibit does not state plaintiffs' names, addresses, or personally identifying information as part of the metadata anywhere (Compl. Exh. F at 2). Because the exhibits supplementing the complaint do not include plaintiffs' personally identifying information in connection with their music selection, the motion to dismiss this claim under Rhode Island and Michigan law is **GRANTED**.

*Second*, the complaint fails to provide sufficient factual support of the allegation that developers accessed customers' personal listening information associated with users via tokens. In plaintiffs' opposition to Apple's motion, plaintiffs cite 🚩 *In re Vizio, Inc. Consumer Privacy Litigation*, 238 F.Supp. 3d 1204, 1225 (C.D. Cal. March 2, 2017) (Judge Josephine Staton) to show that they sufficiently stated a claim. There, the complaint specifically alleged that the defendant

Case 4:22-cv-11107-FKB-DRG    ECF No. 15-3, PageID.625    Filed 09/19/22    Page 22 of 22

Wheaton v. Apple Inc., Not Reported in Fed. Supp. (2019)

had disclosed customers' personally identifying information, including MAC addresses and IP addresses, in connection with their information on the same network. To support the plaintiffs' claim, the complaint in that case provided two case studies where researchers identified individuals based on the information provided. *Id.* at 1212.

Unlike the specified claim and evidence provided in *In re Vizio*, here, plaintiffs' complaint does not sufficiently state a claim nor furnish support for the claims. For example, the complaint says tokens "are capable of association with uniquely identifying information pertaining to individual users" (Compl. ¶ 63). Then the complaint goes on to provide a conclusory statement that "Apple readily possesses information reflecting each of the instances in which it has disclosed [*sic*] its customers' [p]ersonal [l]istening [i]nformation ..." (*ibid.*). The complaint does not explain what a token is, how Apple discloses personal listening information to developers, or what information developers can access via a "token." The complaint does not provide enough facts for this order to infer that Apple is liable under this claim. As such, Apple's motion to dismiss this claim under Rhode Island and Michigan law is **GRANTED**.

**\*6** *Third*, plaintiffs fail to establish standing as to their gifting claim in the complaint. "Named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). In plaintiffs' opposition to Apple's motion, plaintiffs cite to *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) in arguing that even if the named plaintiffs are not injured themselves, they still have standing if they have "a direct and substantial interest." This may be true to a certain extent. But *Melendres* clarifies that this is only applicable when plaintiffs' claims "do not implicate a significantly different set of concerns than the unnamed plaintiffs' claims." *Id.* at 1263 (citations and internal quotations omitted). That is not the case here. Plaintiffs do not even sufficiently assert a claim as to gifting on behalf of themselves. The complaint fails to provide any evidence that anyone used the gifting function, let alone suffered an injury. The complaint merely describes the gifting function and then conclusively states "[p]laintiffs are informed and believe, and thereupon allege,

that Apple has also sold, rented, transmitted, or otherwise disclosed its customers [p]ersonal [l]istening [i]nformation to third party data analytics ..." (Compl. ¶¶ 64–65). Apple's motion to dismiss plaintiffs' claim as to gifting under Rhode Island and Michigan law is thus **GRANTED**.

### 3. UNJUST ENRICHMENT.

Apple also moves to dismiss plaintiffs' claim for unjust enrichment. For plaintiffs to claim unjust enrichment, both Rhode Island and Michigan state laws require the defendant to receive a benefit from the plaintiff, resulting in inequity because of the benefit. *Karaus v. Bank of New York Mellon*, 300 Mich. App. 9, 22–23 (2012); *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 113 (R.I. 2005). The complaint alleges that Apple unjustly retained plaintiffs' iTunes purchase fees despite allegedly disclosing plaintiffs' personally identifying information along with their music selections under MIPPPA, RIVRPA, and common law of those states (Compl. ¶¶ 143–54). Plaintiffs' unjust enrichment claims depend, however, on Apple having disclosed their personal listening information. As explained above, plaintiffs' complaint has not sufficiently established that predicate. The motion to dismiss this claim is thus **GRANTED**.

### CONCLUSION

For the reasons stated above, the motion to dismiss is **GRANTED**. Plaintiffs may move for leave to amend by **NOVEMBER 14 AT NOON**. Any such motion should include as an exhibit a redlined version of the proposed amendments that clearly identifies all changes from the initial complaint. This order highlights certain deficiencies in the initial complaint, but it will not necessarily be enough to add a sentence parroting each missing item identified herein. If plaintiffs so move, they should be sure to plead their best case. Any motion should explain how the proposed complaint overcomes all deficiencies, even those this order did not reach.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 5536214

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.