## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSHUA MURRAY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS,<br><br>Defendant. | Case No. 2:22-cv-11107-SFC-DRG<br><br>Hon. Sean F. Cox<br>Mag. David R. Grand |

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS THE
## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

## STATEMENT OF ISSUES PRESENTED

1. Are the FAC's allegations that Defendant, during the relevant pre-July 31, 2016 time period, disclosed Plaintiff's personal reading information in violation of Michigan's Preservation of Personal Privacy Act ("PPPA") sufficient to confer Plaintiff with Article III standing to bring his PPPA claim in federal court?

**Plaintiff's Answer:  Yes.**

2. Does the six-year limitation period found in M.C.L. § 600.5813 govern Plaintiff's statutory claim for violation of the PPPA – a statute that promulgates a cause of action never before recognized at common law and which does not itself specify a limitation period?

**Plaintiff's Answer:  Yes.**

3. Was the limitation period applicable to Plaintiff's PPPA claim tolled for 101 days between March 10, 2020 and June 20, 2020 pursuant to Executive Orders 2020-58 and 2020-122 issued by the Governor of Michigan and Administrative Orders 2020-3 and 2020-18 issued by the Michigan Supreme Court?

**Plaintiff's Answer: Yes.**

4. Does the FAC allege facts plausibly entitling Plaintiff to relief under the PPPA based on Defendant's disclosure of Plaintiff's Private Reading Information to one or more third party between February 9, 2016 (six years plus 101 days before the date on which this action was initiated) and July 30, 2016 (the last date that the unamended version of the PPPA that Plaintiff invokes in this case was in effect)?

**Plaintiff's Answer: Yes.**

5. Do Plaintiff's allegations plausibly suggest that the PPPA applies to Defendant?

**Plaintiff's Answer: Yes.**

6. Do the factual allegations of the FAC demonstrate that Defendant is entitled to judgment as a matter of law pursuant to the PPPA's direct-marketing exception (an affirmative defense to liability)?

**Plaintiff's Answer: No.**

## <u>CONTROLLING AND MOST IMPORTANT AUTHORITIES</u>

M.C.L. § 600.5813

Mich. Executive Order 2020-58

Mich. Executive Order 2020-122

*Krassick v. Archaeological Institute of Am.*, 2022 WL 2071730 (W.D. Mich. June 9, 2022)

*Pratt v. KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022)

*Hall v. Farm Journal, Inc.*, Case No. 21-cv-11811, ECF No. 26 (E.D. Mich. Apr. 5, 2022)

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

*Kinder v. Meredith Corp.*, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ........................................................ i

CONTROLLING AND MOST IMPORTANT AUTHORITIES .............................. ii

TABLE OF CONTENTS ............................................................................. iii

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ....................................................................................... 1

THE PPPA AND PLAINTIFF'S FACTUAL ALLEGATIONS ................................ 2

ARGUMENT ............................................................................................. 4

    I. Plaintiff Has Article III Standing, and the Court Has Subject-Matter Jurisdiction ........................................................................................... 4

    II. The FAC States a Claim for Relief ..................................................... 10

        A. The FAC Adequately Alleges that Defendant is "Engaged in the Business of" Selling Written Materials ................................................... 10

        B. The FAC Alleges Facts Plausibly Suggestive of a Claim for Relief that Accrued During the Relevant Pre-July 31, 2016 Time Period ........................... 12

            1. The "Relevant Pre-July 31, 2016 Time Period" Runs from February 10, 2016 through July 30, 2016 ................................................ 12

            2. The FAC Adequately Alleges that Defendant Disclosed Plaintiff's PRI During the Relevant Pre-July 31, 2016 Time Period ................................ 14

        C.  Defendant Cannot Invoke the "Direct-Marketing Exception," an Affirmative Defense to Liability, at this Stage of the Litigation ....................... 25

CONCLUSION ......................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Blaha v. A.H. Robins & Co.*,
708 F.2d 238 (6th Cir. 1983).................................................................. 13

*Boelter v. Advance Magazine Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016).................................................15, 22, 25

*Boelter v. Hearst Commc'ns, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016)........................................ 1, 15, 22, 23

*Boelter v. Hearst Commc'ns, Inc.*,
269 F. Supp. 3d 172 (S.D.N.Y. 2017).................................................... 10

*Bowles v. Sabree*,
2022 WL 141666 (E.D. Mich. Jan. 14, 2022).......................................... 13

*Bownes v. Borroughs Corp.*,
2021 WL 1921066 (W.D. Mich. May 13, 2021) ...................................... 13

*Cain v. Redbox Automated Retail, LLC*,
981 F. Supp. 2d 674 (E.D. Mich. 2013) .............................................19, 20

*Coulter-Owens v. Time Inc.*,
695 F. App'x 117 (6th Cir. 2017) ...............................................2, 5, 12, 25

*Danvers Motor Co. v. Ford Motor Co.*,
432 F.3d 286 (3d Cir. 2005) .................................................................. 4

*Doe v. Michigan State Univ.*,
989 F.3d 418 (6th Cir. 2021).................................................................. 19

*E.E.O.C. v. J.H. Routh Packing Co.*,
246 F.3d 850 (6th Cir. 2001).................................................................. 22

*Halaburda v. Bauer Pub. Co.*,
2013 WL 4012827 (E.D. Mich. Aug. 6, 2013) ...................................... 10

*Hall v. Farm Journal, Inc.*,
Case No. 2:21-cv-11811 (E.D. Mich.) (Lawson, J.) ..............................12, 13

*Horton v. GameStop Corp.*,
380 F. Supp. 3d 679 (W.D. Mich. 2018) ...........................................1, 15, 19

*Howard v. Onion*,
2022 WL 2065950 (6th Cir. May 17, 2022).......................................... 13

*Jones v. Lacey*,
108 F. Supp. 3d 573 (E.D. Mich. 2015) ................................................. 8

*Kinder v. Meredith Corp.*,
2014 WL 4209575 (E.D. Mich. Aug. 26, 2014) .................................... 10

*Krassick v. Archaeological Institute of Am.*,
2022 WL 2071730 (W.D. Mich. June 9, 2022) (Jarbou, J.) .................... 12

*Lin v. Crain Commc'ns Inc.*,
2020 WL 248445 (E.D. Mich. Jan. 16, 2020) ....................................... 9

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)............................................................................... 4
*Mackey v. Rising,*
  2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) ............................... 13
*Moeller v. Am. Media, Inc.,*
  235 F. Supp. 3d 868 (E.D. Mich. 2017) ......................................... 15
*Nashel v. New York Times Co.,*
  2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) .............. 16, 17, 18, 19
*Perlin v. Time Inc.,*
  237 F. Supp. 3d 623 (E.D. Mich. 2017) .................................... 10, 15
*Pratt v. KSE Sportsman Media, Inc.,*
  586 F. Supp. 3d 666 (E.D. Mich. 2022) ..................................passim
*Ross v. Bank of Am., N.A.,*
  524 F.3d 217 (2d Cir. 2008) .............................................................. 4
*Ruppel v. Consumers Union of United States, Inc.,*
  2017 WL 3085365 (S.D.N.Y. June 12, 2017) ......................22, 24, 25
*Straus v. Governor,*
  592 N.W.2d 53 (Mich. 1999) .......................................................... 13
*Warth v. Seldin,*
  422 U.S. 490 (1975)............................................................................ 4
*Wheaton v. Apple Inc.,*
  2019 WL 5536214 (N.D. Cal. Oct. 25, 2019)................................. 20
*Zimmerman v. 3M Company,*
  542 F. Supp. 3d 673 (W.D. Mich. 2021) ....................................... 14

**Statutes**

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by
    H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) ................................ 1
H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West) ........................................................... 2
M.C.L. § 445.1713(d).....................................................................................................21, 22
M.C.L. § 600.5813 ..........................................................................................................12, 14
Michigan's Preservation of Personal Privacy Act ("PPPA") ..................................passim
S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. §
    445.1711, *et seq.*).................................................................................................................. 1

**Other Authorities**

Mich. Executive Order No. 2020-122 ................................................................................ 13
Mich. Executive Order No. 2020-58 .................................................................................. 13
Mich. Supreme Court Administrative Order No. 2020-18 ............................................. 13
Mich. Supreme Court Administrative Order No. 2020-3 ............................................... 13

**Rules**

Fed. R. Civ. P. 8.................................................................................................................... 14
Fed. R. Civ. P. 12(b)(6) ..................................................................................................19, 22

Plaintiff Joshua Murray submits this response in opposition to Defendant's (National Association of Realtors or "NAR") motion to dismiss (ECF No. 20 (the "Motion" or "Mot.")) the First Amended Complaint (ECF No. 18 (the "FAC")).

## INTRODUCTION

In this action, Plaintiff alleges that NAR violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without his consent, information that identified him as (*inter alia*) a subscriber to NAR's *Realtor* magazine. On behalf of himself and others similarly situated, Plaintiff seeks to recover $5,000, as provided by the PPPA, for each statutory violation. NAR moves to dismiss on two grounds: 1) Plaintiff cannot establish Article III standing; and 2) Plaintiff fails to state a claim, arguing that it is not engaged in selling written material and that Plaintiff fails to adequately allege that NAR disclosed his Private Reading Information ("PRI") to third parties during the relevant pre-July 31, 2016 time period. *See* ECF No. 20. Each  argument is without merit.

First, the Sixth Circuit and courts nationwide unanimously agree that a plaintiff

---

[1] The PPPA is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, effective 7/31/16, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued."). Because the claims alleged herein accrued, and thus vested, prior to the 7/31/16 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

who states a claim for relief under the PPPA, as here, necessarily has Article III standing to pursue that claim in federal court. *See Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017) (finding alleged violation of the PPPA gives rise to Article III standing).

Second, The FAC adequately alleges that NAR is "engaged in the business of" selling written materials and that Plaintiff's PRI was disclosed during the relevant time period. The FAC states a timely claim for relief. The Motion should be denied.

## THE PPPA AND PLAINTIFF'S FACTUAL ALLEGATIONS

In 1988, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials" by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West). Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

During the relevant pre-July 31, 2016 time period, NAR continuously (on a monthly basis) "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its Michigan-based subscribers" to various third parties and did so throughout the entire time period. *Id.* ¶¶ 5, 7. Defendant maintains a vast digital database comprised of all of its customers' information, their PRI "as well as myriad

other categories of individualized data and demographic information." FAC ¶ 7.

NAR disclosed mailing lists with Plaintiff's and the entire class's PRI to: data aggregators and data appenders, who supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NAR; data cooperatives, who in turn gave NAR access to their own mailing list databases; and once enhanced with the above additional information, to third parties, including direct-mail advertisers and all kinds of solicitors. *Id.* ¶¶ 64-66.

The FAC includes a screenshot of the *Realtor Magazine* subscriber "data card" publicly available on list broker NextMark, Inc.'s website, in which NAR offers to rent or exchange the PRI of *all* of its subscribers – current "through" January 10, 2022 – to anyone interested in purchasing it. *Id.* ¶ 2; ECF No. 18-2. Plaintiff further alleges that "[t]he same or a substantially similar 'data card' as the one shown [in ¶ 2], with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Defendant as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period[.]" *Id.* ¶ 3.

Thus, NAR was renting, selling, exchanging, and disclosing all of its customers' PRI to third parties during the relevant period. *Id.* ¶ 3. "As a result of NAR's practices of disclosing [his PRI] during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox over the same time period." *Id.* ¶ 4.

## <u>ARGUMENT</u>

I.     **Plaintiff Has Article III Standing, and the Court Has Subject-Matter Jurisdiction**

Defendant argues that Plaintiff lacks Article III standing to bring his PPPA claim in federal court. Mot. at 14, PageID.1197-1201. The argument is baseless. Controlling Sixth Circuit precedent holds that a violation of the PPPA, in and of itself, necessarily works concrete, particularized harm that satisfies the injury-in-fact prong of Article III. Numerous federal district courts have faithfully applied this holding in scores of prior PPPA cases, and this Court must now do the same here.

To establish Article III standing, a plaintiff must allege an "irreducible constitutional minimum" of an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Injury in fact is a low threshold." *See Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). It "is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.). The Supreme Court has held that "[t]he injury required by Article III can exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

Article III's standing requirements are readily satisfied here. The Sixth Circuit has unequivocally held that a plaintiff alleging a claim for violation of the PPPA has Article III standing to pursue that claim in federal court because a violation of the PPPA necessarily results in the nonconsensual dissemination of information reflecting a plaintiff's personal reading choices – an acute invasion of his or her statutorily protected

4

right to privacy in such matters that inflicts harm in a concrete and particularized (albeit an intangible) way, readily satisfying Article III's injury-in-fact requirement. *See Coulter-Owens*, 695 F. App'x at 121 ("In short, given that the [PPPA] contains an express private right to sue, it confers statutory standing on a person whose information was disclosed in violation of it. Moreover, the disclosure of that information is a cognizable injury in fact for purposes of Article III standing.").

Thus, every federal district court to have considered the question in the PPPA context has concluded that a plaintiff who adequately alleges a violation of the statute necessarily has Article III standing to seek relief in federal court. *See Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 676-77 (E.D. Mich. 2022) (concluding same and citing cases). Notably, Defendant does not cite to any decision in which a PPPA plaintiff has been found to lack Article III standing.

Instead, Defendant argues that the Sixth Circuit's holding in *Coulter-Owens* somehow *deprives Plaintiff of Article III standing.* That makes no sense. *Coulter-Owens* explicitly holds that "the disclosure of [a person's] [Private Reading] [I]nformation is a cognizable injury in fact for purposes of Article III standing." *Coulter-Owens*, 695 F. App'x at 121. Because the FAC adequately alleges that Defendant disclosed Plaintiff's Personal Reading Information to another person, as discussed in detail below, Plaintiff has suffered a "a cognizable injury in fact for purposes of Article III standing." *See id.*

Defendant nevertheless argues that Plaintiff "cannot establish the narrow privacy injury protected by the PPPA . . . [b]ecause he did not purchase the magazine." Mot. at

5

12, PageID.1199. According to the Motion, Plaintiff's allegation that he "purchased his subscription to *Realtor* magazine directly from NAR at the price of $6.00" is "demonstrably false" because "he received it for free as a member." Mot. at 12, PageID.1199 (quoting FAC ¶ 12). This argument fails for several reasons. For one thing, the Court should reject Defendant's attempt to disprove the factual allegations of the FAC in its motion to dismiss; his allegations must be accepted as true and all reasonable inferences must be drawn from them in the light most favorable to him. Moreover, in the document attached to the FAC as Ex. E, NAR stated, under oath, that each 2016 subscriber to *Realtor* magazine (including Plaintiff) paid a "yearly subscription price" of $6.00 for his or her *Realtor* magazine subscription. And it makes no difference whatsoever that the $6.00 Plaintiff paid NAR for his *Realtor* magazine subscription was charged to him as part of his yearly NAR membership. The bottom line is that Plaintiff purchased the magazine from NAR for $6.00 when he enrolled as a member in NAR's organization. Thus, by choosing to become an NAR member, Plaintiff chose to become a subscriber to *Realtor* magazine (to the tune of $6.00), as the FAC specifically alleges and as NAR's own document (Ex. E to the FAC) demonstrates.

Moreover, even as an NAR member, Plaintiff could have chosen to stop receiving his *Realtor* magazine subscription in the mail – and yet he chose to keep receiving it. Indeed, during the relevant pre-July 31, 2016 time period (and still today), Defendant's website states as follows: "If you are a member and want to stop receiving the print magazine, sign in to nar.realtor, visit your account, and click on the

Subscriptions & Preferences tab. Under REALTOR® Magazine subscription, you can choose to receive the digital edition of the magazine, or you can unsubscribe. (Association staff have only two choices: Digital or Unsubscribe.)" *See* "Realtor Magazine Services" page of NAR's website, accessed Nov. 12, 2022, accessible at https://www.nar.realtor/magazine/services.  The FAC does not allege, and Defendant submits no evidence to suggest, that Plaintiff unsubscribed to *Realtor* magazine during the relevant pre-July 31, 2016 time period. Instead, he chose to continue receiving what Defendant had sold to him.

Defendant emphasizes that the $6.00 "yearly subscription price" that Plaintiff paid for his *Realtor* magazine subscription was "non-deductible" from his NAR membership dues. Mot. at 12, PageID.1199. But that doesn't matter. Even though the magazine subscription fee is "non-deductible" from the membership dues, the fact remains that Plaintiff still decided to become an NAR member and thus still chose to pay the $6.00 for his *Realtor* magazine subscription. What matters is that Plaintiff could not have subscribed to *Realtor* magazine without paying for it – either by paying the $6.00 "yearly subscription fee" included as part of his NAR membership dues or by paying $56.00 per year for a subscription as a non-member. *See* "Realtor Magazine Services" page of NAR's website, accessed Nov. 12, 2022, accessible at https://www.nar.realtor/magazine/services ("Nonmember subscriptions, U.S. only: $56"). Thus, Plaintiff's subscription to *Realtor* magazine plainly did not, as the Motion would have the Court believe, result in his "passive receipt of unrequested books or

magazines." Mot. at 12, PageID.1199. Rather, Plaintiff chose to purchase a subscription to *Realtor* magazine for $6.00 by enrolling as an NAR member – a magazine subscription that he could not have otherwise received as a non-NRA member without purchasing – and then chose to keep receiving the publication in the mail following his purchase.[2]

Defendant argues that Plaintiff lacks Article III standing "because he publicly touts his NAR membership—and by extension his receipt of [*Realtor*] Magazine." Mot. at 13, PageID.1200. The argument is also baseless. The PPPA conferred on Plaintiff the right to be free from nonconsensual disclosures of his Personal Reading Information pertaining to his *Realtor* magazine subscription – and prohibited Defendant from disclosing his Personal Reading Information absent his consent to any third party at any time. Put another way, the PPPA afforded Plaintiff the right to control the

---

[2] Defendant's *Jones v. Lacey*, 108 F. Supp. 3d 573, 577 (E.D. Mich. 2015) (Mot. at 13) is irrelevant. *Jones* involved a 42 U.S.C. § 1983 privacy claim involving disclosure of the plaintiff's medical status. There the court held that, under the *Fourteenth Amendment*, where the information has been made public, additional disclosure by the defendant did not injure the plaintiff. Importantly here in contrast, Plaintiff's claim is brought under a Michigan statute aimed at protecting the exact type of misconduct alleged. The statute specifically states that entities such as NAR "shall not disclose" a plaintiff's information – absent his or her consent. A nonconsensual disclosure therefore alone produces the requisite injury. Self-disclosure (i.e., of a consensual nature) of any variety does not make a PPPA plaintiff immune from injury as a result of non-consensual disclosures. Moreover, the 'public disclosure' raised by Defendant and attached to its Mot. *merely* states that Plaintiff is a NAR *member*. Nowhere does it state that he subscribes to *Realtor* magazine. And Defendant acknowledges that Plaintiff could have chosen to unsubscribe to the publication even as a member, so Plaintiff's status as a NAR member does not necessarily even equate to a *Realtor* magazine subscriber in the eyes of a visitor to Plaintiff's realtor.com or LinkedIn profiles. Finally, the only other decision to cite *Jones* in the seven years since its issuance also involved an injury brought under a Fourteenth Amendment claim.

proliferation of his Personal Reading Information, including by determining to whom, if anyone, such information is disclosed and the purpose, manner, and timing of any such disclosures. Thus, a mention of Plaintiff's NAR membership on his "realtor.com profile" or on his LinkedIn page (Mot. at 13, PageID.1200), for clients and prospective clients of his to view, obviously does not equate to him consenting to Defendant's wholesale rental, sale, and exchange of his Personal Reading Information to anyone interested in purchasing it, including to the data brokers, data miners, data appenders, data aggregators, aggressive marketing companies, and the various other third parties to whom the FAC alleges NAR trafficked his PRI. So while the Motion fixates on Plaintiff's consensual disclosures of his NAR membership on his realtor.com and LinkedIn profiles, what this case is about is NAR's disclosures of Plaintiff's Personal Reading Information to various third parties ***without Plaintiff's consent*** – disclosures NAR made for its own independent business purposes, i.e., to make money, and which caused Plaintiff to be bombarded with junk mail. *See, e.g.,* FAC ¶ 1.

Plaintiff never consented to Defendant disclosing his PRI to the data brokers, data miners, data appenders, data aggregators, aggressive marketing companies, and the various other types of third parties alleged in the FAC, including during the relevant pre-July 31, 2016 time period. By doing so anyways, Defendant violated the PPPA and invaded Plaintiff's privacy in exactly the manner that the statute was enacted to prevent against. *See Lin v. Crain Commc'ns Inc.*, 2020 WL 248445, at *6 (E.D. Mich. Jan. 16, 2020) ("The alleged violation of Michigan's PPPA implicates [plaintiff's] 'concrete interest' in

the disclosure of his PRI without permission.") (citing cases).

Simply: notwithstanding any consensual disclosures by Plaintiff of his own PRI, NAR's nonconsensual disclosures of Plaintiff's PRI in violation of the PPPA, as alleged in the FAC, worked intangible yet concrete harm on Plaintiff that presents ample constitutional mooring for purposes of Article III. *See Kinder v. Meredith Corp.*, 2014 WL 4209575, at *2 (E.D. Mich. Aug. 26, 2014) (rejecting defendant's argument that "a statutory violation of [PPPA], without actual damages, is insufficient to confer standing," noting that "every single court to consider this interpretation has rejected [defendant's] argument"); *Boelter*, 269 F. Supp. 3d at 185; *Halaburda v. Bauer Pub. Co.*, 2013 WL 4012827, at *3-5 (E.D. Mich. Aug. 6, 2013); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 628 (E.D. Mich. 2017); *Pratt*, 586 F. Supp. 3d at 673.

## II. The FAC States a Claim for Relief

### A. The FAC Adequately Alleges that Defendant is "Engaged in the Business of" Selling Written Materials

NAR argues that the FAC "fail[s] to plead facts demonstrating that NAR is 'engaged in the business of selling at retail, renting, or lending books or other written materials.'" Mot. at 15, PageID.1202 (quoting M.C.L § 445.1712(1)). The argument is without merit.

As alleged in the FAC, NAR "is the publisher of *Realtor*." FAC ¶ 13. "As a magazine publisher that sells subscriptions to consumers, NAR is engaged in the business of selling written materials at retail." *Id.* ¶ 60. "Plaintiff purchased his

subscription to *Realtor* magazine directly from NAR at the price of $6.00." *Id.* ¶ 12. These factual allegations plainly demonstrate that NAR was engaged in the business of selling magazine subscriptions at retail during the relevant pre-July 31, 2016 time period. Further, as shown above, NAR sells its magazine to non-members for $56.00 per year.[3]

Defendant says that it "did not sell a magazine to any member." Mot. at 17, PageID.1204. But this assertion is belied by Defendant's own "Brand Report" for *Realtor* magazine, in which Defendant states, under oath, in connection with an audit into the annual subscribership for *Realtor* magazine, that for the six-month periods of January-June 2016 and July-December 2016 there were 1,143,079 and 1,197,251, respectively, ***paid subscriptions*** to Realtor magazine, each of which was ***sold by Defendant to an NAR member at the price of "$6.00."*** FAC ¶ 12 (citing *id.,* Ex. E at 3-4 ("Brand Report" for *Realtor* magazine).

According to Defendant, "Plaintiff has alleged nothing about NAR's business and how it allegedly involves the selling of written materials at retail, as required by the PPPA." Mot. at 17, PageID.1204. But as outlined above, the FAC alleges that Defendant sold a *Realtor* magazine subscription directly to Plaintiff and to the members of the Class. By selling magazines directly to Plaintiff and Class members, as opposed to through an intermediary (such as a subscription agent), Defendant was engaged in

---

[3] To the extent the Court finds this material for purposes of deciding the Motion (it should not be), Plaintiff respectfully requests leave to amend the complaint to add an allegation that Defendant sells the publication for $56.00 to non-members.

the business of selling written materials at retail – as a matter of law. *See Coulter-Owens*, 695 F. App'x at 124 ("Because Coulter-Owens is the end consumer, the sale to her [by the publisher] was necessarily 'at retail.'").

### B.   The FAC Alleges Facts Plausibly Suggestive of a Claim for Relief that Accrued During the Relevant Pre-July 31, 2016 Time Period

Defendant argues that Plaintiff "fails to allege facts sufficient to show that [Defendant] disclosed Plaintiff's PRI between May 20 and July 30, 2016." Mot. at 18, PageID.1205. The argument is without merit.

The "relevant pre-July 31, 2016 time period," as referenced in the FAC, begins on February 10, 2016 – six years (pursuant to M.C.L. § 600.5813) plus 101 days (pursuant to the Governor of Michigan's executive orders tolling the limitation periods for all civil actions issued during the COVID-19 pandemic) prior to the commencement of this action on May 20, 2022 – and ends on July 30, 2016 (the last date the version of the statute invoked in this case existed). And the FAC alleges numerous facts to plausibly suggest that Defendant disclosed Plaintiff's PRI during that period.

### 1.   The "Relevant Pre-July 31, 2016 Time Period" Runs from February 10, 2016 through July 30, 2016

The Eastern and Western Districts of Michigan are in unanimous agreement that "the six-year statute of limitations in [M.C.L.] § 600.5813 governs a PPPA claim." *Krassick v. Archaeological Institute of Am.*, 2022 WL 2071730, at *5 (W.D. Mich. June 9, 2022) (Jarbou, J.); *Pratt*, 586 F. Supp. 3d at 673 (Ludington, J.) ("A six-year statute of limitations applies to PPPA claims."); *Hall v. Farm Journal, Inc.* (Lawson, J.), 2:21-cv-11811 ECF No. 26,

PageID.718 ("The plaintiff's claim is governed by Section 5813, and therefore, the claim appears to be timely for the purpose of this motion.").

Additionally, the applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58; Mich. Supreme Court Administrative Order No. 2020-3; Mich. Executive Order No. 2020-122; Mich. Supreme Court Administrative Order No. 2020-18; *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983).[4]

---

[4] Defendant half-heartedly argues that Plaintiff cannot benefit from the 101 days of COVID-19 tolling pursuant to the Governor's orders: "Plaintiff filed the original complaint on May 20, 2022, nearly two years after the state of emergency had ended, and when Plaintiff's asserted six-year statute of limitations had not yet expired. Because the deadline to "commence" the action did not expire during the declared state of emergency, there was no deadline to toll, and Plaintiff should not get the benefit of an additional 101 days." Mot. at 19-20, PageID.1206-07 n.6 (citing Mich. Sup. Ct., Administrative Order 2020-3 (Mar. 23, 2020) (provided that "[f]or all deadlines applicable to the commencement of all civil and probate case-types, including…the deadline for the initial filing of a pleading…any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included[.]")). This argument fails for the reasons articulated in several recent decisions from the Eastern and Western Districts of Michigan interpreting the Governor's tolling orders as tolling the limitation periods for all Michigan civil actions by 101 days. *See, e.g., Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D. Mich. Sept. 3, 2021) (holding that "all deadlines applicable to commencement of all civil…actions and proceedings were tolled for a period of a little over three months" pursuant to the Governor's COVID-19 Orders); *Bownes v. Borroughs Corp.*, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) (holding plaintiff's Michigan state-law claim was tolled from March 10, 2020, through June 20, 2020 by Governor's COVID-19 Orders); *Bowles v. Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022) (same); *see also Howard v. Onion*, 2022 WL 2065950, at *2 (6th Cir. May 17, 2022) (concluding same under Ohio law). And Defendant cites *Pratt*, 586 F.

Thus, pursuant to the six-year limitation period set forth in M.C.L. § 600.5813 and the Governor's executive orders, the statutory period at issue in this case runs from February 10, 2016[5] through July 30, 2016.

### 2. The FAC Adequately Alleges that Defendant Disclosed Plaintiff's PRI During the Relevant Pre-July 31, 2016 Time Period

Review of the FAC is governed by the liberal Rule 8 pleading standard. Plaintiff is not required to prove her claim with evidence at this time. She must merely allege facts that plausibly suggest Defendant violated the PPPA. *See, e.g.*, *Zimmerman v. 3M Company*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (Rule 8 pleading standard satisfied in class action where named plaintiffs alleged that they were exposed to purportedly harmful chemical in drinking water, without alleging "whether any PFAS ha[d] been detected in their drinking water, and if so, how much").

The FAC alleges that during the relevant pre-July 31, 2016 time period, NAR "continuously and systematically" disclosed (at least "on a monthly basis") its *entire* digital customer database (comprised of the PRI of *all* of its customers, including Plaintiff and all Class members) to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 3, 7.

Supp. at 675 (Mot. at 19 n.6, PageID.1206), in an effort to show that *Pratt* found that Covid tolling did not apply, but the plaintiff there did not argue for tolling (or even raise the issue) in response to the defendant's motion to dismiss.

[5] Six years is 2,190 days. Six years plus 101 days is 2,291 days. And the 2,291st day prior to May 20, 2022 (the date the original Complaint was filed) was February 10, 2016. *See Pratt*, 586 F. Supp. 3d at 675 n.6 (calculating limitation period the same way).

Moreover, the FAC further alleges that NAR's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiff and each Class member) has been advertised by NAR for rent, sale, and exchange on the open market since as far back as the beginning of 2015 and throughout the relevant pre-July 31, 2016 time-period, and that over the same time period NAR in fact routinely disclosed that entire customer database to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1, 3, 5, 7-9, 12, 44-46, 63-68. Plaintiff substantiates these factual allegations by including a screenshot of a data card posted on data-broker Nextmark's website that offers "renters access to the mailing list titled 'REALTOR MAGAZINE Mailing List', a list which the data card indicates is comprised of the [PRI]" of all of NAR's subscribers. FAC ¶ 2, Ex. A (ECF No. 18-2). The data card indicates that the data is cumulative of all subscribers, with "counts through 01/10/2022." *Id.*

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016); *Perlin*, 237 F. Supp. 3d at 642; *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016). But the FAC does not stop there. Here, Plaintiff further alleges that "[t]he same or a substantially similar 'data card' as the one shown above, above, with the same or similar rates and advertised

demographic and personal information about each U.S. based subscriber as listed above, was also publicly advertised by NAR as far back as the beginning of 2015 and for the entire duration of the pre-July 31, 2016 time period – thus demonstrating that NAR was actively renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties, on a regular basis (at least as frequently as once a month), during the relevant pre-July 31, 2016 time period." FAC ¶ 3. Moreover, the FAC also alleges that, "[a]s a result of NAR's practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox over the same time period." *Id.* ¶ 4. These additional factual allegations – which were not alleged by the plaintiffs in the above-cited cases (but who were nonetheless found to have adequately stated PPPA claims) – only further confirm that Plaintiff has stated a plausible claim for relief here.

The decision in *Nashel v. New York Times Co.*, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022), heavily relied on in the Mot., – is readily distinguishable and, in any event, an outlier that was wrongly decided. The *Nashel* plaintiffs pointed to data cards "published online in 2007 and 2008" to support their allegations that the defendant disclosed its subscribers' eight years later during the applicable limitation period – and the court in *Nashel* seized on this "timing issue" in its order granting defendant's motion to dismiss. *See Id.* at *5. Here, on the other hand, there is no such "timing issue" because the FAC

16

includes a screenshot of the "REALTOR MAGAZINE Mailing List" still today offered for sale by NAR on Nextmark's website, which shows that NAR's practices of systematically disclosing all of its customers' PRI and other data (to third party data appenders, aggregators, renters, and others) has persisted "through 01/10/2022," after the relevant pre-July 31, 2016 time period. FAC ¶ 2; *see also* Ex. A (ECF No. 18-2).[6] The FAC further alleges that a substantially identical data card existed in 2015 and 2016, for the duration of the relevant 2/10/16 through 7/30/16 time period, thus demonstrating that NAR was engaged in the same systematic disclosures practices back then that it remains engaged in today. FAC ¶ 2; *see also id.* ¶ 3. Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16 disclosures were unsupported by a data card that post-dated that timeframe, here Plaintiff has pled facts clearly establishing (and at the very least plausibly suggesting) that NAR disclosed Plaintiff's and Class members' (and all of its other customers') PRI to third parties between at least 2015 and 2022.[7]

---

[6] The screenshot of NextMark's data card in the FAC establishes that NAR's mailing list continued to be available online after the relevant pre-July 31, 2016 time period, whereas the screenshots in *Nashel* from 2007 and 2008 show that the New York Times mailing lists were available before the relevant pre-July 31, 2016 time period. Data sets comprise information gathered in the past. That is, a 2022 data set concerns actions taken in or prior to 2022 – evidenced by the language of the mailing list itself ("counts through") and as corroborated by numerous factual allegations of the FAC (*see, e.g.*, FAC ¶¶ 8, 12, 44-51, 63-68). The same may not be said of the 2007 and 2008 *Nashel* data cards screenshots, which pre-dated the relevant pre-July 31, 2016 time period.

[7] The court in *Nashel* failed to address the plaintiffs' allegations – similar to those made by Plaintiff here – that they saw an "uptick in junk mail" in their mailboxes that coincided with the defendant's disclosures of their personal information to third parties (including aggressive marketers) during the relevant pre-July 31, 2016 time period.

Moreover, unlike in *Nashel*, in this case Plaintiff has attached to the FAC archived copies of Defendant's websites, in effect during the relevant pre-July 31, 2016 time period, in which Defendant admitted that it was actively engaged in renting and otherwise disclosing all of its subscribers" PRI to third parties for money. FAC ¶ 8 & Exs. B-D. For example, Ex. B to the FAC demonstrates that on March 21, 2016, Defendant's website stated as follows: "Reach out to our 1 million real estate professionals through our subscriber list. Subscriber names and addresses are rented on a per usage basis. Markets can be separated geographically or demographically. Contact Danny Grubert, danny.grubert@lakegroupmedia.com or (914) 925-2449 at Lake Group Media for more information." *Id.* ¶ 8 & Ex. B. This not just plausibly demonstrates, but in fact conclusively confirms, that Defendant was actively disclosing its entire subscriber database (including Plaintiff's and all Class members' PRI) to Lake Group Media and numerous other third-party renters (among other entities), smack-dab in the middle of the relevant pre-July 31, 2016 time period.

Unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the FAC state a claim for violation of the PPPA. The FAC specifically alleges that Defendant disclosed its entire subscriber database, including Plaintiff's and all other Michigan customers' Private Reading Information, to numerous third parties during the relevant pre-July 31, 2016 time period. FAC ¶¶ 1-12, 44-51, 63-68.

---

Plaintiff makes a similar allegation here in ¶ 4 of the FAC, and respectfully submits that it further bolsters the plausibility of Plaintiff's entitlement to relief under the PPPA.

Further, *Nashel* is an outlier in PPPA jurisprudence and Plaintiff firmly believes it was wrongly decided. The decision applied a pleading standard far more stringent than Rule 8 imposes,[8] and required specificity that no PPPA plaintiff could ever satisfy. Every other court to have presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as those made by Plaintiff here, has held that these allegations adequately stated a claim under the PPPA – including, most recently, in a well-reasoned, published decision from the Hon. Gordon J. Quist of the Western District of Michigan in *Horton*—*see, e.g.*, *Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp.

---

[8] For one, *Nashel* improperly analyzed the plausibility of *the complaint's allegations. See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible"). This was plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) (in deciding a Rule 12(b)(6) motion to dismiss, "the court must accept all well-pleaded allegations in the complaint as true, and consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief" (citations omitted)). *Nashel* also recast allegations that were plainly factual in nature (such as, *e.g.*, allegations that defendant systematically disclosed subscriber lists containing the plaintiff's PRI to specific third parties over a specific period of time) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See id.*, at *5.

2d 674, 685 (E.D. Mich. 2013) (Rosen, J.) (holding, in PPPA case, that at the motion to dismiss stage "this Court must take Plaintiffs' allegations regarding the relationship between Defendant and its 'unrelated' vendors as true").

Defendant cites to a non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), but it is readily distinguishable. For one, the FAC contains many factual allegations concerning disclosures (made by a publisher pursuant to standard, industry-wide practices (*see* FAC ¶ 36), not by a technology company like Apple) that were not alleged in *Wheaton*. Moreover, in *Wheaton*, the plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied on Nextmark data cards advertising the sale of this *sort* of data to bolster those allegations. *Wheaton,* 2019 WL 5536214, at *4. However, the defendant argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of music files on a phone), unlike the PRI at issue in a case against a publisher such as here (which is comprised of records concerning a purchase of a magazine subscription to one of NAR's publications), was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, 3:19-cv-02883, dkt. 51 at 11-12 (defendant's reply in support of motion to dismiss). Here, on the other hand, NAR does not deny the reasonableness

20

of inferring that rented, sold, and otherwise disclosed records of customers' purchases of subscriptions to *Realtor* from NAR would necessarily have originated from NAR.

What NAR really wants is to turn the PPPA into a toothless tiger. The crux of this case is that NAR *failed to inform* and *failed to obtain consent* from Plaintiff and the class members prior to disclosing their PRI to others. Plaintiff and the class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom NAR made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, NAR asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and insulating NAR from liability in the process. This Court need not go along. The FAC states a claim, and the Motion should be denied.

## C. Defendant Cannot Invoke the "Direct-Marketing Exception," an Affirmative Defense to Liability, at this Stage of the Litigation

NAR attempts to sweep under the rug Exs. B-D to the FAC (printouts from NAR's website during the relevant pre-July 31, 2016 time period), and the admissions it makes in them (that it disclosed its entire subscriber list to third-party renters during the relevant pre-July 31, 2016 time period), by arguing that any rentals of its subscriber list to any third parties would be exempt from the statute pursuant to the "direct marketing exception." Mot. at 21, PageID.1208. This argument fails for several reasons.

Section 445.1713(d) of the PPPA permits a disclosure of a person's PRI where (1) "the disclosure is for the exclusive purpose of marketing goods and services

directly to the consumer"; and (2) "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." "Defendant's claim that its conduct falls within a statutory exemption constitutes an affirmative defense to liability, which may only be raised by a pre- motion answer to dismiss if the defense appears on the face of the complaint." *Hearst*, 192 F. Supp. 3d at 453.

In this case, the defense "does not appear on the face of the [FAC] because Plaintiff specifically alleges [in the FAC] that [he] did not receive notice that Defendant was going to disclose [his] personal information" prior to Defendant disclosing his information to third parties. *Ruppel v. Consumers Union of United States, Inc.,* 2017 WL 3085365, at *1 (S.D.N.Y. June 12, 2017). Specifically, the FAC alleges that, "[p]rior to and at the time Plaintiff subscribed to *Realtor*, NAR did not notify Plaintiff that it discloses the [PRI] of its customers, and Plaintiff has never authorized NAR to do so." (FAC ¶ 12; *see also id.* (alleging that Plaintiff "was never provided any written notice that NAR rents, exchanges, or otherwise discloses its customers' [PRI], or any means of opting out"); *id.,* ¶ 71 ("Plaintiff and the members of the Class did not receive notice before NAR disclosed their [PRI] to third parties."). At this stage of the proceedings, the Court must accept these allegations as true and deny the Motion. *See Ruppel,* 2017 WL 3085365, at *2 (denying motion to dismiss pursuant to Rule 12(b)(6) based on same allegations); *Hearst,* 192 F. Supp. 3d at 454 (same); *Advance Mag.,* 210 F. Supp. 3d at 589 (same); *see also E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir. 2001).

Defendant ignores the FAC's allegations that Plaintiffs failed to receive notice or an opportunity to opt-out of Defendant's disclosures before they occurred and argues that the direct-marketing exception applies because (1) the same "Advertising Opportunities" webpages attached as Exs. B-D to the FAC contain the following statement: "Reach out to our 1 million real estate professionals through our subscriber list. Subscriber names and addresses are rented on a per usage basis. Markets can be separated geographically or demographically," *e.g.,* FAC, Ex. C at 4; and (2) because "archived versions of NAR's website . . . contain[] (and . . . contained, since before 2016) a method to opt out of direct mail marketing," Mot. at 21, PageID.1208. But the FAC does not reference any opt-out option on Defendant's website, so Defendant cannot rely on the declaration and attached exhibit it submits on this issue in moving to dismiss. Moreover, the "Advertising Opportunities" webpages attached to the FAC as Exs. B-D are advertiser-facing, not subscriber-facing, webpages, which no subscriber would have ever had any reason to even frequent, rendering those webpages plainly incapable of satisfying the notice required by the direct-marketing exception. In fact, as previously mentioned, the FAC specifically alleges that Plaintiffs were not provided any such notice prior to the disclosure of their PRI. *See* FAC ¶¶ 12, 48-49, 71; *see also, e.g.,* *Hearst*, 192 F. Supp. at 454 (denying motion to dismiss based on direct-marketing exception where complaint's allegations contradicted defendant's assertion that it provided prior notice to plaintiffs).

Additionally, the disclosures at issue in this case cannot possibly fall within the

direct-marketing exception because they were not made for the "exclusive purpose of marketing goods or services directly to the consumer," i.e., to Plaintiff. Indeed, even if Defendant had provided prior notice to Plaintiff that it would share his PRI with third parties, the Motion still fails because the FAC alleges several facts demonstrating that Defendant disclosed Plaintiff's PRI for numerous purposes having nothing to do with marketing goods or services, let alone directly to him. The FAC alleges that Defendant, "**[t]o supplement its revenues**, [] rents, exchanges, or otherwise discloses its customers' [PRI], as well as myriad other categories of individualized data and demographic information such as age, gender, and income—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers." FAC ¶ 7; *see also id.* ¶¶ 7-8, 12, 44-50, 63-66, 74 (describing disclosures to data aggregators, data cooperatives, and list renters).

Thus, based on the factual allegations of the FAC, there is no basis for the Court to conclude, as a matter of law, that NAR's disclosures of Plaintiff's PRI were made for the "**exclusive** purpose of marketing goods or services directly to [Plaintiff]." *See, e.g., Ruppel*, 2017 WL 3085365, at *2 ("[E]ven if Plaintiff did receive notice that Defendant was going to share his personal information with third parties, the PPPA's safe harbor permits disclosures only 'for the exclusive purpose of marketing goods and services directly to the consumer.' Defendant's supposed disclosures do not satisfy this requirement because Defendant allegedly sells its mailing lists to 'data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and

solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.' NAR's contention is thus contradicted by Plaintiff's allegations[.]"); *Advance Mag.*, 210 F. Supp. 3d at 589 ("The allegations thus include dissemination to data miners to enhance the value of the PRI, which does not neatly fall within the exception for disclosure with the exclusive purpose of marketing directly to a consumer."). Indeed, the Sixth Circuit has noted that disclosures to data aggregators and cooperatives, like those alleged here (*see* FAC ¶¶ 7, 12, 64-65) do not fall within the ambit of the exemption. *See Coulter-Owens*, 695 F. App'x at 120.

Finally, as previously mentioned, Defendant's disclosures of Plaintiff's PRI to third parties who do not even sell goods or services – such as charitable and political organizations that are looking for contributions and donations, in exchange for the provision of no goods or services – plainly do fall within the exception the Motion attempts to invoke. *See, e.g.*, *Ruppel*, 2017 WL 3085365, at *2.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.[9]

Date: November 15, 2022                    Respectfully Submitted:

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

---

[9] In the unlikely event the Court finds any deficiencies in the allegations of the FAC, Plaintiff requests leave to amend to cure those deficiencies.

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (P85862)
Philip L. Fraietta (P85228)
888 Seventh Avenue
New York, NY 10019
Tel: 646-837-7150
jmarchese@bursor.com
pfraietta@bursor.com

**HEDIN HALL LLP**
Frank S. Hedin
1395 Brickell Avenue, Suite 1140
Miami, FL 33131
Tel: 305-357-2107
fhedin@hedinhall.com

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
