UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOSHUA MURRAY,**
Plaintiff,

v.

**NATIONAL ASSOCIATION OF REALTORS,**
Defendant.
______________________________/

**Honorable F. Kay Behm**

**No. 22-cv-11107**

**DEFENDANT'S 12(b)(1) and 12(b)(6) MOTION TO DISMISS**

**Wednesday, August 23, 2023**
**(All parties appearing via Zoom videoconference.)**

Appearances:

On behalf of Plaintiff
E. Powell Miller, Gregory A. Mitchell
The Miller Law Firm
950 W. Univeristy Drive, #300
Rochester, Michigan 48307
248-841-2200
epm@millerlawpc.com, gam@millerlawpc.com

Frank S. Hedin
Hedin Hall LLP
1395 Brickell Ave
Suite 900
Miami, FL 33131
305-357-2107
Email: fhedin@hedinhall.com

ALSO PRESENT: David W. Goodrich, paralegal

\- - -

*To obtain a certified transcript, contact:*
*Andrea E. Wabeke*
*Federal Official Court Reporter • Certified Realtime Reporter*
*810.341.7849 · www.transcriptorders.com*
*Transcript produced using machine shorthand and CAT software.*

APPEARANCES, continued:

Tina Demas
Cooley LLP
110 N. Wacker Dr.-42 Fl.
Chicago, IL 60606
312-881-6500
tdemas@cooley.com

Khary Anderson
Cooley LLP - Library
Litigation
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
202-776-2160
Email: kjanderson@cooley.com

Elise Hyejin Yu
ArentFox Schiff LLP
350 S. Main Street
Suite 210
Ann Arbor, MI 48104
734-222-1556
Email: Elise.Yu@afslaw.com

**I N D E X**

\- - -

| | PAGE |
|---|---|
| Argument by Ms. Demas............................ | 4 |
| Argument by Mr. Miller........................... | 16 |
| Reply Argument by Ms. Demas...................... | 40 |
| Surreply Argument by Mr. Miller.................. | 42 |

Flint, Michigan

Wednesday, August 23, 2023

2:05 p.m.

\- - -

**THE COURT:** Murray versus National Association of Realtors. The case number is 22-11107. I have Mr. Miller here on behalf of the Plaintiff, as well as counsel, Frank Hedin and Greg Mitchell, and David Goodrich. I have for Defendant Tina Demas, along with Elise Hu and Khary Anderson.

And, Ms. Demas, this is your motion to dismiss. If you would like to go ahead with your arguments, please.

**MS. DEMAS:** Thank you, your Honor.

There are two core reasons why the Court should dismiss the complaint here. One is that the Plaintiff lacks standing. He publicly disclosed the same information that he is suing NAR for allegedly disclosing and there's no concrete injury. Two, the Plaintiff fails to state a PPPA claim, and I'm going to apologize. I promise I will trip on PPPA at least five times during this oral argument. I will try my best not to do that, and there are two parts to this pleading failure for the failure to state a claim.

One is that the Plaintiff fails to sufficiently allege that NAR, a trade association, is engaged in the business of selling magazines at retail, as he must allege, to state a PPPA violation; and, second, the Plaintiff fails to allege the

disclosure of PPPA protected information before July 31st, 2016, which is when the statute was amended to remove statutory damages.

So I'm going to start with standing, because that goes to the Court's subject matter jurisdiction.

This case is on all fours with *Crane versus American Bar Association*. That's at 22-cv-11267, and, in that case, Judge Berg dismissed the case for lack of standing because the Plaintiff, very similar to the Plaintiff here, had disclosed publicly his ABA membership and, thereby, his status as a subscriber to ABA's magazine, and the Court should reach the same result here. The cases are virtually indistinguishable.

Here, as in *Crane*, the Defendant has sued an association made up of members who receive, as part of their membership, a magazine. In *Crane*, the association was the American Bar Association, and the magazine was the ABA Journal, and, here, the association is NAR, and the magazine is Realtor Magazine, and, in *Crane*, the Court found that the Plaintiff lacked standing because he, himself, had publicly advertised his ABA membership, and, consequently, his ABA Journal subscription.

In *Crane*, the advertisement that the Plaintiff did was on his firm's website and on the State Bar of Michigan's website. Here, Mr. Murray publicized his NAR membership and, therefore, his Realtor Magazine subscription and on realtor.com and on LinkedIn, both publicly available websites. So, really, the

only difference between this case and *Crane* is the name of the Defendant and the name of the magazine.

The complaint here and in *Crane* had almost the exact same allegations. They both attach a very similar data card from NextMark as their first exhibit, and those data cards, I submit, are revealing, because they equate membership in the association to magazine receipts, and with the Court's permission, I have a PDF that I can share that compares the two data cards, if I'm able to share, and these are both publicly available documents. I pulled the American Bar Association one from the docket in *Crane*, and NAR's, obviously, as part of the complaint.

So you can see here that the list, the next card [*sic*] data card from ABA talks about ABA members all receive subscriptions to the ABA Journal, and it equates members and subscribers. For Realtor Magazine, it says, "Subscribers are real estate professionals who are members of NAR and adhere to a strict code of ethics."

And, in this case, the Plaintiff makes the exact same arguments in favor of Article III standing that Judge Berg rejected in *Crane*, and the Court should do the same here.

Now, first, it's not enough to simply allege a statutory violation where it's divorced from a concrete injury. *Spokeo* and *TransUnion* both say that courts need to look beyond the mere statutory violation and ask is the harm concrete? Does it

actually exist? And, in this case, it does not, because we are here. Being a member equals being a magazine subscriber, and the Plaintiff publicizes his membership and, therefore, his magazine receipt. There's no concrete harm, and that's what Judge Berg held in *Crane*.

Now, the Plaintiff here, in his opposition brief, argued that even though he publicly disclosed his information, he still somehow suffered a concrete injury because NAR's alleged disclosure of the same information deprived him of the right to control his information. This argument makes absolutely no sense. Once someone has made information public, it's out there, and, as the Court in *Crane* explained, there, the Plaintiff exercised that control and published to the entire world the very facts he claims the ABA revealed. *Crane*, the Plaintiff cannot now be heard to complain that he was injured by the ABA's republication of what *Crane* then revealed and continues to reveal now. The claimed harm does not resemble any of the common law privacy torts discussed above.

Now, the second point I'm going to make as to standing is the earlier PPPA cases where courts found standing consistently refer to the injury that can give rise to standing as, quote, privacy in reading habits and privacy in reading choices, and the Plaintiff here cannot establish that injury on a factual challenge to standing because he cannot show an invasion of privacy of reading material that he affirmatively chose to

receive. The Plaintiff received Realtor Magazine because he is an NAR member and all members automatically get the magazine.

Now, the Plaintiff alleges that he bought a subscription to Realtor Magazine from NAR, but this allegation isn't entitled to any weight on a factual challenge to standing, especially where Plaintiff incorporated into the complaint Exhibit B, which states the member's yearly subscription price is included in the dues and is not nondeductible therefrom. So the magazine was a free and nondeductible membership benefit and Plaintiff cannot show an invasion of privacy in his reading choices.

And the third and last point that I'm going to make about Article III standing is that the privacy interest protected by the PPPA in the context of this particular case does not have the required close relationship to a harm that traditionally has been regarded as providing a basis for a lawsuit in English or American courts, and that's what *Spokeo* requires. The PPPA was invented by legislative fiat. It is not a creature of the common law. It is nothing like the qui tam actions that *Spokeo* relied on for the concept of a traditional harm, and, as Judge Murphy recognized in *Nashel*, "No Michigan case filed before 1989 included a tort invasion of privacy claim based on the right to privacy in one's reading materials or the dissemination of one's name and address."

And Judge Jarbou -- and I hope I'm saying her name

right -- in *Bozung* observed recently that the violation of the right to privacy protected by the PPPA is not a traditional common law tort, and if you dig through the internal citations and PPPA cases involving standing, the closest analogy that courts have come to a, quote, traditional harm is the tort of commercial appropriation of a Plaintiff's name or likeness, and the Plaintiffs agree with this.

At Page 9 of their opposition brief, the Plaintiff argues that the PPA -- excuse me, the PPPA afforded the Plaintiff the right to control the proliferation of his P.R., including by determining to whom, if anyone, such information is disclosed and the purpose, manner, and timing of such disclosures. Well, there's two problems with this argument. One, the commercial appropriation branch of the right to privacy is also a creature of statute, not the common law.

And Judge Ebinger explained this in great detail in *Burke versus Meredith*, a similar mailing list case, brought under a different statute, they were right of publicity statutes in *Burke versus Meredith*. So this tort, this commercial appropriation tort cannot form the basis of a traditional harm, and, second, as Judge Berg found in *Crane*, where the Plaintiff had exercised his own control and published to the world the facts that he claims that NAR revealed, then there's just no privacy injury left.

And the same is true here, where the Plaintiff has

disclosed to the entire world both his identity in the form of his photo, which is on both his LinkedIn profile and the realtor.com profile and his NAR membership. There's no intangible harm. There's no Article III injury, and the Court should dismiss for lack of subject matter jurisdiction.

I'm going to move on to the 12(b)(6) arguments, unless the Court has questions.

Okay. Beyond the Article III defect, the Plaintiff fails to state a PPPA claim. The first prong of this that they've failed to sufficiently allege that NAR is engaged in the business of selling at retail lending -- excuse me, renting or lending books or other written materials, as the statute requires, and any allegation about NAR being, quote, engaged in the business that appears in the complaint, is either vague, conclusory, or contradicted on the face of the complaint.

So, for example, Plaintiff alleges he purchased his subscription to Realtor Magazine directly from NAR at the price of $6, but that allegation is contradicted by Exhibit E, which is part of the complaint, and it states that 100 percent of the magazines circulated were provided as a, "membership benefit to NAR members," and the $6 subscription price is, "included in the dues and nondeductible therefrom," and it's well-established that when an exhibit contradicts the complaint, the exhibit trumps the allegations.

Now, the Plaintiff also fails to allege a disclosure of

his information in a way that violates the PPPA before July 31st, 2016, and that's assuming, for the sake of argument, that the six-year statute of limitations applies. Now, I know this is not the Court's first PPPA case. I'm familiar with your Honor's decision in *Gaines*, and I'm going to quickly touch on the limited scope of the PPPA before getting to the meat of this argument.

One, it does not prohibit the disclosure of all data. It only prohibits disclosure of information that identifies a purchaser of books or other written material at retail and the specific written material so purchased. The statute does not prohibit the disclosure of a trade association membership list, and it does not prohibit the disclosure of information that identifies someone who purchases magazines that are not at retail. The Sixth Circuit's decision in *Coulter-Owens* makes clear that the PPPA does not cover resellers.

And there's also a direct marketing exception. Under the statute, there's no prohibition on the disclosure of magazine purchase information if it's for the exclusive purpose of marketing goods and services directly to a consumer so long as the consumer is informed in writing that they can remove their name at any time by written notice to the person disclosing the information.

And the problem with the complaint here -- and we're now at the second amended complaint -- is that apart from

conclusory and speculative allegations that the Court can and should disregard, there's no allegation that Plaintiff -- excuse me, that NAR disclosed the Plaintiff's information before July 31st, 2016 when statutory damages were still available.

Now, Plaintiff relies heavily on that advertisement from NextMark that I showed a couple of minutes ago, which is titled Realtor Magazine Mailing List and has the only date on is January 10th, 2022. That ad does not contain the Plaintiff's data or any person's data. It wasn't published by NAR and there's no allegation that NAR did publish that ad, and the date on this ad is January 2022, which postdates the relevant period by about six years.

So the Plaintiff is asking the Court to make the illogical inferential leap that because this ad existed in 2022, NAR must have disclosed the Plaintiff's data to data appenders, data cooperatives, and other third parties before July 31st, 2016, but this type of inferential leap is not supported by *Iqbal* or *Twombly*.

Judge Murphy, in *Nashel*, faced a similarly outdated data card. That was an earlier data card from 2008, and he found that a complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right is insufficient, and, here, as in *Nashel*, there's nothing in this NextMark ad that explains how NextMark received the

subscription list.

And in *Bozung*, as this Court is aware, Judge Jarbou dismissed a nearly identical complaint as the one here which also relied on a NextMark data card. That case, the data card was from 2022. So it's the same difference in time. The Plaintiff is trying to allege that what happens, something that exists six years in the future is somehow predictive of what happened six years in the past.

Now, in *Bozung*, the Court said, look, even assuming that that data card advertised the sale of information about every single *Christianbook* customer -- that was the magazine at issue there -- including customers from 2015 and 2016, the Plaintiff was asking the Court to infer that because NextMark was offering that information for sale in 2022, that the Defendant must have disclosed that information to a third party between December 15 -- excuse me, between December 2015 and January 2016, and the Court found that that requested inference, though possible, was not plausible, and the Court found it far more likely that Christianbook, the Defendant, had disclosed the data possessed by NextMark more recently and dismissed the case for failure to state a claim.

Now, I'm aware, very much aware of the Court's decision in *Gaines*, and I submit that this case is distinguishable and fits more into the realm of *Bozung* and *Nashel* than *Gaines*.

Now, in *Gaines*, the complaint included the 2022 NextMark

screenshot, but there's an additional allegation not present here that seemed crucial to the Court's decision, because in *Bozung*, the Plaintiff alleged that during the relevant July 31st, 2015 period, the time when statutory damages were still available, that NextMark offered to provide renters access to a specifically titled mailing list. They called it the, "Ranger Rick Marketing Genetics Masterfile," and then they put a detail from that mailing list that -- excuse me, data card that existed in 2016 stating that it contained the personal reading information of 753,350 of NWF's then active and recently expired U.S. subscribers at a base price of $1.05 per thousand, and your Honor found that this specific allegation, quoting the contents of that card for the relevant period, caused the amended complaint in *Gaines* to pass the threshold of plausibility.

But, here, there's no equivalent allegation to push the complaint past that same threshold, it's just the 2022 data card and the unsupported and speculative claim that the same or substantially similar data card was advertised as far back as the beginning of 2015 and for the entire duration of the July -- excuse me, the pre July 2016 period, and that is not enough.

Now, I'm sure my colleague, Mr. Miller, will point to Exhibit B, the additional opportunities printout from NAR's website, and we've addressed that. We addressed that in our

moving brief. That exhibit falls squarely within the PPPA's direct marketing exception. That much is clear from *Coulter-Owens* where the Sixth Circuit observed that selling Plaintiff's information under Defendant's list rental business would fall within the direct marketing of 1713(d).

Now, Plaintiff incorporated the Defendant's website by freely citing to it and attaching exhibits from NAR's website to the second amended complaint. That same website has contained things before 2016, a method to opt out of direct mail marketing, which we submitted as part of the Doyle declaration. That's a document that the Court can take judicial notice of. So the Plaintiff can't have it both ways by selectively incorporating one document and then arguing that the Court cannot consider the same -- another portion, excuse me, of the same website that contradicts their claim.

So there are multiple paths to dismissal in this case. There's both lack of standing and failure to state a claim.

And I would say that this is not a typical PPPA case. It's a membership list case where there's no injury. The Plaintiff publicized his NAR membership and, by extension, his receipt of Realtor Magazine, and the 2022 data card does not push his allegations past the threshold of plausibility. The case should be dismissed and the Court has multiple paths to get there. Thank you, your Honor.

**THE COURT:** Thank you, Ms. Demas.

Mr. Miller, your arguments, please.

**MR. MILLER:** I am ready. Thank you very much, your Honor. Good afternoon. Powell Miller for the Plaintiff.

Data mining today is very similar to the gold rush of the 19th century. Publishers like the National Association of Realtors, NAR, take advantage of this multibillion dollar industry. It's standard practice for publishers to disclose subscriber information. Your Honor, that's one of the ways that they make money.

What I have learned from prosecuting dozens of these cases is that these companies work with data aggregators to create dossiers on Michigan citizens that pose a grave threat to privacy. The Michigan legislature created the personal -- Preservation of Personal Privacy Act to protect privacy in reading materials because what one reads can reveal a great deal about a person's life. The Michigan statute gave publishers a clear path to avoid liability. They don't have to sell the data for Michigan consumers or they can get permission to do it. The Defendant did neither. The NAR simply ignored the PPPA as a cost of doing business.

This is a routine and straightforward case to enforce the Michigan PPPA. Over the last seven years, about 100 of these statutory privacy cases have been prosecuted with great success, as many of these companies, like the NAR, simply ignore the roadmap the Michigan legislature gave them to avoid

liability. These cases have dramatically improved the privacy rights of our citizens. Most defendants settle these cases without even attempting a motion to dismiss because the PPPA is essentially strict liability. The overwhelming majority of motions to dismiss have been denied, both on 12(b)(6) grounds and standing grounds. In fact, 17 have been denied to date, plus Magistrate Judge Altman's report and recommendation in the *NTVB* case which is pending before your Honor, and many of these cases have been published.

More particularly, your May 2023 opinion in *Gaines V National Wildlife Federation* is right on point and was cited and quoted with approval in a subsequent May 2023 opinion from Judge Bernard Friedman in the *Bottom Line* case, which denied a similar motion to dismiss in a PPPA case.

Your Honor clearly has Article III standing based upon controlling Sixth Circuit authority. This case is about a clear violation of the PPPA where the Defendant, without the consent of the Plaintiff, sold or transferred data to data aggregators. There are now 17 district court opinions and one magistrate report and recommendation denying similar motions to dismiss. The Sixth Circuit's controlling opinion in *Coulter-Owens* explicitly holds that "The disclosure of a person's private reading information is a cognizable injury in fact for purposes of Article III standing," and that's a quote because the second-amended complaint alleges that Defendant

disclosed Plaintiff's private reading information. Plaintiff has suffered a cognizable injury in fact for purposes of Article III standing.

So you have a concrete injury, pursuant to the Sixth Circuit, from a statutory violation and you have a concrete injury because we specifically allege that the violations of the PPPA led to an increase in unwanted junk mail, and while I will deal with Judge Berg's opinion in *Crane V ABA* later, I note here that it conflicts with the controlling Sixth Circuit authority, which found that there is in fact Article III standing for these cases.

The complaint properly alleges that the Plaintiff purchased the Realtor Magazines. The Defense argues that Plaintiff did not purchase his magazine because it is a free membership benefit. This is an improper attempt to argue the facts at the motion to dismiss stage. We pled at Paragraph 11 of the second-amended complaint that he purchased the magazine and that is all that is required at the motion to dismiss stage, and that's what your Honor held in *Gaines*.

We don't have to prove our case now, and of course that's well-accepted law in this circuit, but while no proof is necessary, we did plead proof. Exhibit E attached to the second-amended complaint, the National Association of Realtors stated under oath that each 2016 subscriber to Realtor Magazine, including the Plaintiff, paid a yearly subscription

price of $6 for his or her Realtor Magazine subscription, and it makes no difference whatsoever that the $6 Plaintiff paid NAR for his Realtor Magazine subscription was charged to him as part of his yearly NAR membership. The bottom line is that Plaintiff purchased the magazine from NAR for $6 when he enrolled as a member in NAR's organization. Thus by choosing to become an NAR member, Plaintiff chose to become a subscriber to Realtor Magazine in the amount of $6 as part of his yearly subscription fee, as the SAC specifically alleges and as NAR's own document confirms.

Your Honor, the Defense makes irrelevant, technical arguments in their brief, like the so-called nondeductibility of the membership fee. That is patently irrelevant. Plaintiff decided to become an NAR member and thus chose to pay the $6 for his Realtor Magazine subscription. What matters is that the Plaintiff cannot have subscribed to the magazine without paying for it.

My mom always said to me, your Honor, that there's no such thing as a free lunch. The only way anyone can get this magazine is either by paying the $6 as part of their yearly subscription fee included in their membership dues or by separately paying $56 per year for a subscription as a nonmember. That's in the second-amended complaint at Paragraph 48. Thus Plaintiff's subscription to Realtor Magazine plainly did not, as the Defendant's motion would have

the Court believe, result in a passive receipt of unrequested books or magazines.

Rather, Plaintiff chose to purchase this subscription in Realtor for $6 by enrolling as an NAR member, a magazine subscription that he could not have otherwise received as a non-NAR member without purchasing it and then chose to keep receiving the publication in the mail following his purchase by not exercising the right they gave him to opt out of it.

Next, she tries to argue that the National Association of Realtors is not a retailer within the meaning of the PPPA. Not so. She has no authority for that, and the Sixth Circuit has clearly held contra in the controlling case of *Coulter-Owens* that where the Defendant, as here, sells direct to the Plaintiff and class members as opposed through an intermediary such as a subscription agent, the Defendant was engaged in the business of selling written materials at retail. As a matter of law, *Coulter-Owens* held that, "because *Coulter-Owens* is the end consumer, the sale to her was at retail." Here, Mr. Murray and the class members are end users. So the Defendant is clearly selling at retail.

Let's get to this public disclosure issue because it's a red herring and a make way.

The fact the Plaintiff made a disclosure in LinkedIn and another website that he is a member of the NAR is irrelevant to a PPPA violation. The PPPA is about nonconsensual disclosure

of data, not consensual disclosure. That is simply a member of the NAR. The PPPA does not exempt from liability and give the Defendant a free pass to sell data merely because he puts on a website that he is a member of an organization. The PPPA concerns Defendant's wholesale rental sale and exchange of his data to data brokers, data miners, data appenders, data aggregators, aggressive marketing companies and the like to whom the second-amended complaint alleges that the NAR unlawfully trafficked his private reading information.

While the Defense motion fixates on Plaintiff's consensual disclosures of his NAR membership on his realtor.com and LinkedIn profiles, which I know, your Honor, they don't even say that he disclosed that at the time of the violations in 2016. So it fails for that reason alone, but let's assume that he did during that period. It's irrelevant because what this case is about is NAR's nonconsensual disclosures of Plaintiff's private reading information to third party data companies without Plaintiff's consent, data that ends up enhancing the dossiers on Michigan consumers held by private, motivated data companies.

Your Honor, these data companies don't scour through millions of LinkedIn profiles to find out how they can create a dossier to sell to marketers. What they want is the mouse click, that they can download thousands and thousands and thousands of subscriber lists to sell data. What he put on his

LinkedIn profile is completely irrelevant. It's the mass transmission of data that ends up enhancing the dossiers of Michigan consumers held by profit motivated data companies that the PPPA addresses.

The disclosures that the NAR made for its own motive to make money caused Plaintiff to be bombarded with junk mail. That doesn't happen, despite putting on LinkedIn that you're a member of the NAR. They are completely different animals. Thus, their reliance on the *ABA* case is misplaced.

First, the Court, in *ABA*, made two fundamental mistakes, and I will show that it's easily distinguishable anyway. The mistakes were, one, not to follow the controlling authority in *Coulter-Owens* that a violation of the PPPA creates standing. Doesn't matter if someone discloses on a website that they are a member of an organization. The statute deals with this in mass transmission of data to these data companies.

The fact that he disclosed his NAR membership on public websites does not authorize the NAR to sell data to data aggregators without his consent. They are entirely different animals, consensual disclosure of membership versus nonconsensual disclosure of magazine subscription data. So two fundamental differences, one, a membership versus a magazine subscription, and, second, consent versus nonconsent. These data aggregators buy the data in one fell swoop. They don't scour millions of LinkedIn profiles.

So the Court got it wrong, because it misapprehended the PPPA, but you don't have to get there, your Honor, because it's easily distinguished on its facts. The Plaintiff there, Mr. Crane, disclosed exactly what the Defendant was selling, that the ABA advertised and sold the ABA membership, and Ms. Demas got that part right, but the part that she respectfully got wrong is the other side of the equation is different. Here, the Defendant, NAR, advertised and sold Realtor Magazine lists, not memberships in an organization but magazine subscription lists. Mr. Crane told the world, "Yes, I am an American Bar Association member," and that is what the ABA sold.

Here, the Plaintiff, Mr. Murray, never told the world he is a subscriber to Realtor Magazine, and that's how the data cards are different. The ABA data card deals with members. The Realtor Magazine doesn't identify members of the NAR, it specifically identifies subscribers to Realtor Magazine, regardless of whether they are members through the NAR. The *ABA* decision, in stark contrast, and the Court on Page 9 said that "The record shows that *Crane* exercised that control and published to the entire world the very facts he claims the ABA revealed."

That's not true here at all because these data cards are fundamentally different. ABA is a membership list, and, in NAR, it's the magazine subscriber list. The *ABA* decision

states on Page 1 that as an ABA member, the Plaintiff in that case there necessarily subscribes to the ABA Journal. That's right. The Plaintiff in the *ABA* case provided information about his ABA membership and, therefore, his ABA Journal subscription to third parties. Because the Plaintiff there publicly advertised his ABA membership and consequently his ABA Journal subscription, he could not allege a concrete injury and lacked standing according to that court, but, here, unlike in the *ABA* case, no one knows that Mr. Murray is a subscriber to Realtor Magazine.

Just because he says on LinkedIn he's a member of the NAR, there is nothing to connect the public to Mr. Murray being a subscriber to Realtor Magazine. It's only that he's a member of the NAR. This is because members of the NAR can opt out of receiving the magazine. So a voluntary disclosure by an NAR member does not reveal that they read Realtor Magazine, and because nonmembers can buy standalone subscriptions to Realtor Magazine, even though they're not members. In other words, not all NAR members' information appears on the magazine list that NAR trafficked on the open market, and the list also includes information about Realtor magazines purchased by non-NAR members.

Thus, a disclosure by Plaintiff that he is a member of the NAR was not the type of disclosure that the statute prohibits, because his disclosure concerned his NAR membership, and, as

far as a third party purchaser of NAR's list is concerned, disclosing to the third party that Plaintiff was an NAR member does not inform the third party that he is a subscriber to Realtor Magazine. In order to learn that Plaintiff was a subscriber to the magazine, a third party would have needed to buy the list advertised for sale by NAR, which is unlawful under the PPPA and fundamentally different from the *ABA* case, which equates membership with subscriptions, which is not true in the NAR context.

And the *ABA* decision at Page 7 states that Crane's case presents a unique factual situation not found in any other that this court has been able to locate. Crane has already published all of the information he says would cause him injury if disclosed, but that's not the case here.

Whereas the Plaintiff in *ABA* disclosed his membership and thus his subscribership to the ABA Journal, Mr. Murray, here, has not published that he subscribed to Realtor Magazine, and his disclosure of his membership in NAR is not the same thing as disclosing his subscribership to Realtor Magazine.

So that leaves us with two critical points on this *ABA* case. One, the PPPA statute forbids nonconsensual disclosures of data, not the mere voluntary identity of an organization on a website. These are two very different animals. Here, the NAR transfers data without consumer consent to third-party data companies to build dossiers on class members and to be able to

get all this data with a mouse click with one fell swoop. The mere identification of a membership to NAR on a website does not aggregate data to third-party data companies or consent to it in any way.

Two, in the *ABA* case, it was just a membership list. Here, it's the private reading information of Realtor Magazine that is disclosed and not the NAR membership list. The data cards in the complaints are different with what was disclosed. In our case, here, is precisely what the statute forbids.

Your Honor, the second-amended complaint also easily passes muster under 12(b)(6) and properly alleges that the Defendant disclosed his data. The Defendant's arguments cynically abuse *Twombly* and *Iqbal*. This case is as simple as whether the Defendant ran a red light. Did the Defendant transmit private reading information data during the relevant time period to the relevant third party in violation of the PPPA? In other words, did it run the red light? We allege it did.

A review of the proposed second-amended complaint is found by the Rule 8 pleading standard, which is liberal, but Plaintiff is not required to prove her claim of evidence at this time, as your Honor pointed out in your *Gaines* opinion at Page 12, and, most importantly, your Honor sustained the complaint in *Gaines* in virtually identical facts here. Just like *Gaines*, the second-amended complaint alleges that during

the relevant pre July 31, 2016 time period, NAR continuously, systematically, and actively disclosed its entire digital customer database comprised of the private reading information of all of its customers, including Plaintiff and all class members to various third parties, including data appenders, aggregators, brokers, marketing companies, and many others on a monthly basis. Second-amended complaint at Paragraph 6 and 7.

Moreover, the SAC further alleges that NAR's entire customer database containing the personal PPPA protected data pertaining to all of its customers has been advertised by NAR for rent, sale and exchange on the open market as far back as the beginning of 2015 and throughout the relevant pre July 31, 2006 [*sic*], and, over that same time period, NAR, in fact, routinely disclosed that entire customer database to those third-party data-related companies.

And, your Honor, we substantiate these factual allegations, as we did in *Gaines*, by including a screenshot of a data card posted on NextMark's website that offers renters access to the mailing list titled Realtor Magazine Mailing List, a list which the data card indicates is comprised of the PRI of all NAR subscribers that goes through January 10, 2022. So the second-amended complaint, just like *Gaines*, pushes these allegations across the line of plausibility by alleging that, and I quote, "The same or substantially similar data card as the one shown above with the same or similar rates and

advertised demographic and personal information about each U.S.-based subscriber is listed above was also publicly advertised by NAR as far back as the beginning of 2015 and for the entire duration of the pre July 31, 2006 time period, thus demonstrating that NAR was actively renting, selling, and exchanging and otherwise disclosing the customer's personal reading information." And that's in the second-amended complaint at Paragraph 2, and we allege, as a result of these violations, the Plaintiff saw a dramatic uptick of junk mail in his mailbox over the same period.

In *Gaines*, your Honor distinguished *Nashel*, and Judge Friedman quoted your Honor's opinion with approval and agreed with you and also distinguished *Nashel* for the same reasons applicable here. That's in the *Bottom Line* case.

The *Nashel* Plaintiffs pointed to data cards published in 2007 and 2008 to support their allegations that the Defendant disclosed its subscribers eight years later during the applicable limitation period, and the Court in *Nashel* seized on that timing issue in granting the motion to dismiss. Here, on the other hand, there is no such timing issue because the second-amended complaint includes a screenshot of the Realtor Magazine Mailing List still offered today for sale by NAR on NextMark's website, which shows that NAR's practices of systematically disclosing all of its customers' PRI and other data has persisted as least through January 10, 2022. I'm not

aware that they stopped, but it's at least through 2022.

The second-amended complaint further alleges that a substantially identical data card existed in 2015 and 2016 for the duration of the relevant February 10, 2016 through 7/30/2016 time period, thus demonstrating that NAR was engaged in these same systemic violations.

Therefore, unlike in *Nashel*, where the Plaintiff's allegations of the 2015 and '16 disclosures were unsupported by a data card that postdated that time frame, here, Plaintiff has pled facts clearly establishing that NAR disclosed Plaintiff's and class members PRI to third parties between at least 2015 through 2022. That reasoning was followed by Judge Friedman in *Bottom Line*, but, your Honor, we're even stronger than *Gaines* and *Bottom Line* because we attached to the SAC archived copies of Defendant's websites in effect during the relevant pre July 2016 time period in which the Defendant admitted that it was actively engaged in renting and otherwise disclosing all of its subscribers PRI to third parties for money.

For example, we cite Exhibit B to the SAC that Defendant's website stated as follows, "Reach out to our one million real estate professionals through our subscriber list, subscriber names and addresses are rented on a per usage basis. Markets can be separated geographically or demographically. Contact Danny Gruber," and then it gives his address. So we allege specific admissions with exhibits to our second-amended

complaint that prove that they did it, yes, that they ran the red light. Our case is that simple.

Now, Ms. Demas relies heavily on *Bozung* and *Christianbook*, which both you and Judge Friedman distinguished in your opinions. What she doesn't tell you is that Judge Jarbou has since reversed herself. What happened in *Bozung*, your Honor, is that Judge Jarbou allowed us to engage in discovery while the motion to dismiss was pending. Just hours before she released her initial opinion granting the motion to dismiss without prejudice, we got the key evidence in discovery proving the allegations. We subsequently filed our Rule 36 motion, which she granted, and reinstated the case, and, what's more important, is that Judge Jarbou, on the next two PPPA cases where were motions to dismiss were filed, she denied them both. That's *Gottsleben v Informa* case and *Schreiber versus Mayo.*

So her Honor wasn't persuaded by *Bozung* one, but now *Bozung* two goes from the Defense side to the Plaintiff's, and this proves my point about cynical defense strategy abusing *Twombly* and *Iqbal*. They like to nitpick the allegations in the complaint but they never deny the seminal fact that their client did it, and so what happens is and when we get discovery we prove it. We get discovery in this case, we'll prove it. It's a standard industry practice. They also rely on *Wheaton*, which is an out-of-circuit nonbinding unpublished decision which your Honor distinguished in *Gaines* and your Honor's

distinguishment applies here.

And now I'd like to move to the next point, statute of limitations. They don't spend much time on this; I won't either, because I think this one is so clear and obvious that Michigan district courts are unanimous in holding that the six-year statute applies. Seven district court opinions and one magistrate judge opinion in the Eastern District of Michigan all reject the Defendant's argument without dissent, without disagreement. These are outstanding jurists, including Judge Lawson, Judge Ludington, Judge Friedman, Judge Jarbou, Judge Murphy, Judge Kumar, all agree that it's a six-year statute.

Courts in PPPA cases also agree that Covid tolling applies to give us another 101 days from March 10, 2000 to June 20th, 2000 [*sic*], and we don't need Covid tolling to survive the motion to dismiss. It's only really relevant to damages, your Honor, how far the look back is, but I will note that every single court since the Michigan Court of Appeals held in *Carter* in 2023, a published opinion, that Covid tolling means that the statute of limitations is extended for those 101 days have applied that to PPPA cases. The law in that area is 100 percent unanimous, each and every case has decided. That's the *NTVB* case, the *Gannett* case, Judge Kumar, the *Bozung* case, Judge Jarbou, and the *Gottsleben* case, the more recent case from Judge Jarbou from July 7, 2023 says you're at the

101 days.

Now, I'd like to go to the direct marketing exception, which is absolutely baseless. Section 445.1713(d) of the version of the statute in effect prior to July 31, 2016, which is the version at issue in this case, and I want to put a pin on that for a second, because when Ms. Demas argued that we must prove the specific written material so purchased, she quoted that language from the statute. That's the wrong version of the statute, your Honor. That's a subsequent amended statute that doesn't control the July 31, 2016 time period.

All that we were required to plead, and which we did plead is that the Defendant disclosed private reading information regarding the Realtor Magazine, a lesser standard during the 2016 time period. We meet the higher standard anyway because we're very detailed allegations about what was pled, but we easily meet the standard for what was required to be disclosed under the PPPA.

But the correct statute, and that's why it's important to look at the right one, because our case fits within the pre-amendment statute. That's why the July 31, 2016 date is critical. We don't go past July 31, 2016. Our case is prior to July 31, 2016, where the exemption for marketing says, "for the exclusive purpose of marketing goods and services directly to the consumer," but in order to apply this exception, that

statute also requires "that the person disclosing the information shall inform the customer by written notice that the customer had removed his or her name at anytime by written notice to the person disclosing the information."

Your Honor, they can't come within the exception because the disclosures at issue in this case cannot fulfill the requirement of the direct marketing exception that the disclosures were made for the exclusive purpose of marketing goods or services directly to the consumer. What we have alleged in this case is that the reason why they did this wasn't for marketing purposes but to increase their revenues.

In fact, the second-amended complaint alleges that Defendant, quoting our complaint, "to supplement its revenues, rents, exchanges or otherwise discloses his customers' PRI, as well as myriad other categories of individualized data and demographic information such as age, gender, and income to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers." Second-amended complaint at Paragraph 6.

This is fatal to the exception. They didn't do this for marketing. This certainly do it exclusively for marketing. They had a clear and distinct profit motive, which is what we allege, and their argument is notably absent of district courts in Michigan applying this exception to grant motions to dismiss. In fact, the case law, again, is overwhelmingly pro

plaintiff, really, in Michigan and throughout the country. Examples are *Boelter V Hearst* 192 F.Supp. 3d 427 out of the Southern District of New York. "The Defendant's claim that its conduct falls within the statutory exemption constitutes an affirmative defense to liability, which may only be raised by a pre motion answer to dismiss if the Defense appears from the face of the complaint."

Numerous other courts have rejected this defense at the motion to dismiss stage, including the *Ruppel V Consumers Union* case at 2017 Westlaw 3085365 denying a motion to dismiss on direct marketing exemption grounds based on similar allegations here.

Here, the *Advance Magazine* case at 210 F.Supp 3d at 589. "The allegations thus include dissemination to data miners to enhance the value of the PRI, which does not neatly fall within the exception for disclosure with the exclusive purpose of marketing directly to a consumer."

And the *Coulter-Owens* Sixth Circuit case. "Knowing that disclosures to data aggregators and cooperatives like those alleged here do not fall within the ambit of the exemption."

And we have specifically pled, which is all we're required to do at this stage of the case, even assuming arguendo, we have to plead an avoidance of an affirmative defense, which we don't. We have pled that they did not give the Plaintiff and the class members notice and opportunity to avoid these

disclosures, and, at this stage of the case, that pleading controls. So they fail both tests of their direct marketing exception.

In conclusion, your Honor, and I know that was a mouthful, and I'm sorry about that, but, obviously, this is important to my client. You are the gatekeeper to allow this case to go forward. This case is a straightforward PPPA case, like the dozens of others that have been allowed to go forward, and, when they do, the proof that they violated the PPPA comes quickly and settlement comes very quickly thereafter, which is exactly what we're seeing in the *Gaines* case, and what Judge Jarbou learned by experience. She first denied a motion. Then she granted on *Bozung*, but, as we predicted -- and she's an outstanding judge and, no disrespect whatsoever.

In fact, I give her a lot of respect for reinstating that case and then denying the next two motions to dismiss, and they rely heavily on *Bozung* one. I'm sure they didn't know it. I'm in no way casting aspersions to Ms. Demas at all. I'm sure she did not know about the subsequent reversal by Judge Jarbou in granting a Rule 60 motion, but that's, obviously, material to the entire picture of PPPA jurisprudence. These cases are important, your Honor.

These Defendants could have avoided liability. They just should have excluded Michigan consumers or they should have gotten their consent, and just because our guy puts up on

LinkedIn that he's a member of the NAR, that has nothing to do, whatsoever, with the wholesale sale of his and other people's data to the data aggregators who use that data to send unwanted junk mail.

Unless you have any questions, I appreciate the opportunity to present.

**THE COURT:** I want to -- I do have a few questions about *Crane*, because it does seem very similar to *Crane*. So, in this case, he put on his LinkedIn site and he put in the public domain that he was a realtor, that he was a member of the realtor organization, and what you're telling me is that he never says that he receives the Realtor Magazine, correct?

**MR. MILLER:** 100 percent correct, your Honor.

**THE COURT:** All right. And so, in *Crane*, he lists in his information, in his public disclosures, law firm, whatnot, he's a member of the ABA?

**MR. MILLER:** Correct.

**THE COURT:** And he does not say that he gets the ABA Journal, the connection --

**MR. MILLER:** I apologize.

**THE COURT:** Is that right?

**MR. MILLER:** Partially right, but not substantively right, because the data cards are different.

**THE COURT:** Let me get there, okay. So he -- so *Crane* says in his law firm advertisements, "I am a member of

the ABA," correct?

**MR. MILLER:** Correct.

**THE COURT:** So if a user went and looked at the ABA site, it would say "All the ABA members get the ABA Journal," and that's -- and that is how Judge Berg said, "Well, he's already disclosed that he gets this because if you just go to the ABA website, you get the connection to the ABA Journal;" is that right?

**MR. MILLER:** That's my understanding, your Honor, yes.

**THE COURT:** Okay. So if you go to the data card or if you go to the website or the NAR, and it says, "Subscribers are real estate professionals who are members of NAR." So they equate on their site that subscribers are members. How is that different?

**MR. MILLER:** Well, because the data card, your Honor, says "Realtor Magazine Mailing List. Description, Realtor Magazine is the official magazine of the National Association of Realtors." So what the data companies get from the Realtor Magazine from the NAR is they get the data from all of the Realtor Magazine subscribers. The ABA people don't. All they do is get a list of the people who are ABA members, and what's really critically important here, your Honor, is to get the realtor subscription list, you don't have to be an NAR member. Just because you're an NAR member doesn't mean you have the

subscription because the NAR allows opt outs, and even if you're not a member of the NAR, you're a member of our class because folks can buy the Realtor Magazine independent, your Honor, of the NAR and their data is sold. So the NAR is different because it's focused on the magazine, not the membership list, and the magazine subscriptions are different in the NAR context because you don't have to be a member of the NAR to get the magazine, and even if you are a member of the NAR, that does not necessarily mean you get the magazine. They're different animals.

And the other crucial distinction -- so that's where we distinguish Judge Berg, and I love Judge Berg, practiced before him for many, many years, but this is where he got it wrong. Where he got it wrong is not focusing on the purpose of the PPPA and the nature of the disclosures. What the PPPA is about, your Honor, is nonconsensual. The fact that our client tells the world that I'm a member of the National Association of Retailers -- of the real estate professionals, excuse me, isn't telling the world I'm a subscriber to the magazine and isn't consenting to NAR, with one mouse click, transmitting his data and the data of thousands and thousands of other subscribers to these data companies that create these dossiers that cause junk mail. That's a fundamental distinction.

These data companies, your Honor, aren't going through millions and millions of profiles on LinkedIn to try to find

out how do we build a dossier. What they do is go to these data brokers who get the data from these publishers and --

**THE COURT:** So are they -- are you alleging that they sold his name and his address or anything else, or are you just saying that what they sold was that he was a subscriber?

**MR. MILLER:** It has more than that, your Honor. It shows that he's a subscriber. That's the main thing. That's his private reading information. So these advertisers know this guy's interested in real state. So we should gear our junk mail towards stuff about houses, fixing up houses, selling --

**THE COURT:** So your claim is is that they disclosed that he receives the publication, that he's a subscriber, that he was on the subscriber list?

**MR. MILLER:** Yes.

**THE COURT:** Okay.

**MR. MILLER:** I believe there's more. There's demographic information that's included, geographic information that's included.

**THE COURT:** I think I understand. I think those are my primary questions.

Ms. Demas, any response you may have.

**MR. MILLER:** Thank you very much, your Honor.

**THE COURT:** Thank you.

**MR. MILLER:** Appreciate your patience.

**MS. DEMAS:** Your Honor, I'll be quick.

Look, Mr. Miller made my point for me at the beginning of his argument when he said, "By choosing to become an NAR member, Plaintiff chose to become a subscriber to Realtor Magazine." The membership and subscribership here, as in the *ABA* case, are inseparable, and just as in the *ABA* case, where the Plaintiff there did not describe, hey, I subscribe to the ABA Journal, he disclosed I'm an ABA member, and, here, the Plaintiff disclosed I'm an NAR member, and being an NAR member means you automatically get Realtor Magazine. Every single member gets it. Yeah, they can opt out, but the fact is everybody gets it as part of their membership.

And so the distinction that Mr. Miller is trying to draw, between these data cards -- which, by the way, there's no allegation that NAR published these data cards. These come from a third party, NextMark. Both the ABA data card and the Realtor Magazine data card equate subscribers and members of the organization, as your Honor pointed out, and when -- and I will say another thing. Mr. Miller said something that suggests that *Coulter-Owens* stands for the proposition that merely alleging a PPPA violation is enough, even on a factual challenge to standing. It's not.

That is not what *TransUnion* says. If that were the case, there would have been no reason for the Supreme Court to have looked at the actual Plaintiff's injuries in *TransUnion*. The

Court could have just said, "Nope, they've alleged a statutory violation, and that's enough," but that's not what the Article III standing jurisprudence requires courts to do, and this is a factual challenge to standing, and so contrary to what Mr. Miller said -- and I'm not sure what he meant by this, but when he suggested that the Court can't look at the facts on a factual challenge to standing, well, that's, that's just wrong, in the most basic of ways.

On a factual challenge to standing, which is what we have mounted here and which is what the Plaintiff in *Gaines* did, there's no presumptive truthfulness attached to the Plaintiff's allegations. The burden to establish subject matter jurisdiction shifts to the Plaintiff and the Court can weigh the evidence and resolve factual disputes.

So what we have here is, really, one for one the same situation that the Court encountered in *Gaines*, and where the Plaintiff is disclosing publicly his membership in NAR and, therefore, his receipt of the magazine, there is no injury. There cannot possibly be one, and that's the thrust of our standing argument here, which we've been very clear about from the beginning, that this is a factual challenge to standing.

So I will make one last point, which is the bombardment of junk mail argument that the Plaintiffs made. You know, we pointed that out in a footnote in our -- I think it was in our opposition -- I'm sorry, not our opposition, in our reply, but

that allegation is not entitled to any credence given what's been revealed through the allegations and the attached documents. The Plaintiff has been an NAR member since 2007, and which is set forth in the declaration of Colleen Doyle. If becoming a member of the NAR and getting the magazine because, according to Plaintiffs, NAR has been engaged in this practice from time immemorial, if there were to be some dramatic uptick in junk mail, one would have expected it to happen when Mr. Murray became and NAR member in 2007, not in 2015. So these bad allegations I submit, which Mr. Miller places a lot of weight on, is not entitled to any belief at all.

**MR. MILLER:** Forty seconds? That's all.

**THE COURT:** I am actually late for another call.

**MR. MILLER:** Okay.

**THE COURT:** Give me two sentences and then I'm going to go.

**MR. MILLER:** Okay. Okay. I'll try just two seconds. I did not admit that the NAR automatically equates to NAR subscriptions. I said the opposite because there are opt outs. NAR members can opt out and you can buy the magazine even if you aren't a member. My last sentence --

**THE COURT:** I heard that.

**MR. MILLER:** Thanks. My last sentence is *Coulter-Owens* clearly holds that a valid -- that a violation of the PPPA statute, which we allege is tethered to an Article III

violation.

Go to your call. I'm sorry. Thank you.

**THE COURT:** That's okay. Thank you everyone. Have a good day. We'll issue a written opinion.

**MS. DEMAS:** Thank you.

(Proceedings concluded 3:13 p.m.)

\- - -

**C E R T I F I C A T I O N**

I, Andrea E. Wabeke, official court reporter for the United States District Court, Eastern District of Michigan, Southern Division, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date hereinbefore set forth. I do further certify that the foregoing transcript has been prepared by me or under my direction.

/s/Andrea E. Wabeke — September 28, 2023

Official Court Reporter — Date
RMR, CRR, CSR

\- - -