UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA MURRAY,                                    Case No. 22-11107

     Plaintiff,                              F. Kay Behm
v.                                               United States District Judge

NATIONAL ASSOCIATION OF
REALTORS,

     Defendant.
_____ /

## OPINION AND ORDER DENYING MOTION TO DISMISS
## THE SECOND AMENDED COMPLAINT (ECF No. 31)

## I.    PROCEDURAL HISTORY

Plaintiff, Joshua Murray, filed a proposed class action complaint on May 20, 2022 and a second amended complaint (SAC) on January 20, 2023 against the National Association of Realtors (NAR).  (ECF Nos. 1, 30).  Murray alleges that NAR violated Michigan's Preservation of Personal Privacy Act (PPPA), Mich. Comp. Laws § 445.1711, *et seq*., by disclosing, without his consent, information that identified him as a subscriber to NAR's REALTOR® magazine and proposes a class action for all those similarly situated.  NAR moves to dismiss the SAC, contending that Murray lacks Article III standing, fails to state a claim, and his claim is barred by the statute of limitations.  (ECF No. 31).  This matter is fully briefed, and the

court heard oral argument on August 23, 2023.  For the reasons set forth below,

NAR's motion to dismiss is **DENIED**.

## II.    FACTUAL BACKGROUND

In 1988, the Michigan Legislature enacted the PPPA to protect "privacy with

respect to the purchase, rental, or borrowing of certain materials" by prohibiting

companies from disclosing certain types of sensitive consumer information.  *See*

H.B. No. 5331, 1988 Mich. Legis. Serv. 378.  Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials, sound
> recordings, or video recordings shall not disclose to any
> person, other than the customer, a record or
> information concerning the purchase . . . of those
> materials by a customer that indicates the identity of the
> customer.

Mich. Comp. Laws § 445.1712(1).  In May 2016, the Michigan Legislature

amended the PPPA.  *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016)

(codified at Mich. Comp. Laws § 445.1711, *et seq*.).  The earlier version of the

PPPA allowed a customer to recover "[a]ctual damages, including damages for

emotional distress, or $ 5,000.00, whichever [was] greater."  *See* Mich. Comp.

Laws § 445.1715 (1989).  However, the 2016 amendment limits recovery to actual

damages, removing the statutory-damages provision.  *See* Mich. Comp. Laws

§ 445.1715 (2016).  The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date.  *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods*., 511 U.S. 244, 286 (1994)).  Plaintiff contends that the claims alleged in the Amended Complaint accrued prior to the July 31, 2016 effective date of the amended version of the PPPA, and thus, the pre-amendment version of the PPPA applies in this case.  *See e.g*., *Horton v. GameStop Corp*., 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

According to the SAC, during the relevant pre-July 31, 2016 time period, NAR continuously (on a monthly basis) "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information ["PRI"] of its Michigan-based subscribers" to various third parties and did so throughout the entire time period. (ECF No. 30, ¶¶ 4, 6).  The SAC alleges that NAR maintains a vast digital database comprised of all of its customers' information, their PRI "as well as myriad other categories of individualized data and demographic information."  *Id*. at ¶¶ 6, 43.

Murray alleges that NAR disclosed mailing lists with his and the entire class's PRI to: data aggregators and data appenders, who supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NAR; data cooperatives, who in turn gave NAR access to their own mailing list databases; and once enhanced with the above additional information, to third parties, including direct-mail advertisers and all kinds of solicitors. *Id*. at ¶¶ 43-50.

The SAC includes a screenshot of the REALTOR® Magazine subscriber "data card" publicly available on list broker NextMark, Inc.'s website, in which NAR offers to rent or exchange the PRI of all of its subscribers – current "through" January 10, 2022 – to anyone interested in purchasing it. *Id*. at ¶ 2; ECF No. 30-2. Murray further alleges that "[t]he same or a substantially similar 'data card' as the one shown [in ¶ 2], with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Defendant as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period[.]" *Id*. at ¶ 2. Accordingly, Murray maintains that NAR was renting, selling, exchanging, and disclosing all of its customers' PRI to third parties during the relevant period. *Id*. at ¶ 4. And, "[a]s a result of NAR's practices of disclosing [his PRI] during the

relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox over the same time period." *Id*. at ¶ 3.

## III.   ANALYSIS

### A.   Standard of Review

#### 1.   *Standing*

A challenge to a party's Article III standing invokes a federal court's subject matter jurisdiction and is properly raised by a motion made under Federal Rule of Civil Procedure 12(b)(1).  *In re Blasingame*, 585 B.R. 850, 858 (B.A.P. 6th Cir. 2018), aff'd, 920 F.3d 384 (6th Cir. 2019) (citing *Allstate Ins. Co. v. Global Med. Billing, Inc*., 520 F. App'x 409, 410-11 (6th Cir. 2013) (unpublished) (citations omitted); *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013)).  As explained in *McQueary v. Colvin*, No. 15-00068, 2017 WL 63034, at *3 (W.D. Ky. Jan. 5, 2017), a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)."  *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)).  "A facial attack is a challenge to the sufficiency of the pleading itself.  On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving

party." *McQueary*, at *3 (quoting *Ritchie*, 15 F.3d at 598); *see also Cartwright*, 751 F.3d at 759 ("A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the Court takes the allegations of the complaint as true for purposes of the Rule 12(b)(1) analysis").

"A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *McQueary*, at *3 (quoting *Ritchie*, 15 F.3d at 598).  And, where a plaintiff relies on evidence outside the complaint to support a standing claim, the challenge is factual, and the Court instead must assess the factual basis for jurisdiction by weighing the evidence tendered.  *Forgy v. Stumbo*, 378 F. Supp. 2d 774, 776 (E.D. Ky. 2005) (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)); *see also Kardules v. City of Columbus*, 95 F.3d 1335, 1347 n. 4 (6th Cir. 1996) (The Sixth Circuit has recognized a district court's authority to consider extrinsic evidence when addressing the issue of standing.).  Here, NAR launches a factual attack, relying on evidence outside the four corners of the Amended Complaint.  Accordingly, the court is required to "weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter."  *Bowers v. Wynne*, 615 F.3d 455, 457 (6th Cir. 2010) (citing *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 887 (6th Cir. 2005)).

2.      *Rule 12(b)(6)*

In deciding a motion to dismiss under Rule 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] ... [and] accept all well-pled factual allegations as true*." League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the complaint must "contain[ ] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief, such as "when an affirmative defense ... appears on its face."  *Jones v. Bock*, 549 U.S. 199, 215 (2007) (quotation marks omitted).  A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged."  *Id*. at 678.

However, a claim does not have "facial plausibility" when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679.  The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527.  Showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6).  At the motion-to-dismiss stage, the court does not consider whether the factual allegations are probably true; instead a court must accept the factual allegations as true, even when skeptical.  *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id*. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual

allegations"). Indeed, in assessing the sufficiency of a complaint, the court must determine only whether "'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *See United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

B.    Article III Standing

Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies. U.S. Const. art. III, § 2. An essential component of the case-or-controversy requirement is the doctrine of standing, which "limits the category of litigants empowered to maintain a lawsuit in federal court to [those who] seek redress for a legal wrong." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 342–43 (6th Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To invoke the jurisdiction of a federal court, a plaintiff must demonstrate that he has standing to sue, a requirement "rooted in the traditional understanding of a case or controversy." *Spokeo*, 136 S. Ct. at 1547. To establish standing, a plaintiff has the burden to establish that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial ruling." *Id*. At the pleading stage, the standing inquiry asks whether the complaint "clearly ... allege[s] facts

9

demonstrating each element" of the standing inquiry.  *Id*. (quotation marks omitted).

As discussed below, the primary dispute before the court is whether Murray suffered an injury in fact.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id*. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The key question here is whether Murray has alleged an injury that is "both concrete and particularized."  *Id*.  "A bare procedural violation, divorced from any concrete harm" will not satisfy Article III's injury requirement.  *Spokeo*, 578 U.S. at 341.  A plaintiff cannot satisfy the injury-in-fact requirement just by pointing to a statute that grants them a statutory right, because "an injury in law is not an injury in fact."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

As the *Larkin* court explains, particularization is generally easy to understand.  An injury is particularized if it "affect[s] the plaintiff in a personal and individual way."  *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1).  The claimed injury cannot be a generalized grievance shared by all members of the public.  *DaimlerChrysler Corp*., 547 U.S. at 342-44.  Rather, the plaintiff himself must have personally suffered an actual injury or an imminent threat of injury.  *Id*.; *see also*

*Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020) (affirming a dismissal for lack of standing because the plaintiffs themselves had no stake in the lawsuit).  On the other hand, concreteness is more challenging.  "A concrete injury must be de facto; that is, it must actually exist."  *Larkin*, 982 F.3d at 1064 (quoting *Spokeo*, 136 S. Ct. at 1548 (quotation marks omitted)).  That is, a concrete injury is one that is "real, ... not abstract."  *Id*. (quotation marks omitted).  But "concrete" does not necessarily mean "tangible."  Both tangible and intangible harms can satisfy the concreteness requirement, although tangible injuries—e.g., physical harms and monetary losses—are "easier to recognize."  *Id*. at 1549.

*Larkin* further explains that intangible harms often raise more difficult injury-in-fact questions.  In the context of suits seeking relief for statutory violations, "both history and the judgment of Congress play important roles" in the analysis.  *Id*. (citation omitted).  Congress may identify and elevate historically non-cognizable intangible harms to the status of cognizable injuries, and when it does so, "its judgment is ... instructive and important."  *Id*.  But congressional judgment is not conclusive.  Instead, as the Supreme Court emphasized in *Spokeo*, a congressional decision to create a cause of action "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to

vindicate that right." *Id*.  Because Congress (or here, the Michigan Legislature)

cannot override the case-or-controversy requirement, "Article III standing

requires a concrete injury even in the context of a statutory violation." *Id*.  With

these principles in mind, the court will evaluate Murray's contention that he has

alleged a sufficiently concrete injury and thus has standing to assert the claims in

this lawsuit.

NAR argues that Murray's claimed privacy injury is undermined because he

publicly displays his NAR membership, and by extension his receipt of REALTOR®

Magazine.  NAR explains that all its members are allowed to publicize their NAR

membership by using the term REALTOR® next to their names.  (ECF No. 31-1,

Doyle Decl. ¶ 13).  The REALTOR® mark means that a person is a member of NAR

and has agreed to adhere to NAR's Code of Ethics.  *Id*.  NAR members can be

identified by searching realtor.com, a publicly available website, and only active

members are displayed on realtor.com's "Find a REALTOR®" directory.  *Id*. ¶¶ 14-

15.  According to NAR, Murray's realtor.com profile displays the REALTOR® mark

and his NAR membership.  *Id*. ¶ 20 & Ex. A.  Thus, NAR argues that Murray cannot

claim a privacy interest in information he publicly disseminates.  *See Jones v.*

*Lacey*, 108 F. Supp. 3d 573, 584 (E.D. Mich. 2015) ("a would-be plaintiff cannot

assert a constitutional information-privacy claim as to information that was already in the public realm at the time of the alleged privacy breach").

In response, Murray argues that every court to consider the question has concluded that a plaintiff who adequately alleges a violation of the PPPA necessarily has Article III standing. *See Pratt v. KSE Sportsman Media, Inc*., 586 F. Supp. 3d 666, 676-77 (E.D. Mich. 2022) (concluding same and citing cases). And because the SAC adequately alleges that NAR disclosed Murray's PRI, he has suffered a cognizable injury in fact for purposes of Article III standing. Murray says the court should reject NAR's attempt to disprove the allegations in the complaint and accept those allegations as true instead. And here, the Complaint alleges that every subscriber including Murray paid a yearly subscription price of $6.00 and it makes no difference whether that fee was charged to him as part of his yearly membership.

Murray also urges the court to reject NAR's claim that publicly touting his NAR membership dooms his claim to Article III standing. Murray argues that, under the PPPA, he has the right to be free from nonconsensual disclosures of his PRI pertaining to his REALTOR® Magazine subscription and the PPPA prohibits NAR from disclosing his PRI without his consent to third parties. Murray argues that the posting of his membership on his realtor.com profile does not equate to

consent to disclose his PRI to data miners, brokers, etc.  Essentially, Murray again

maintains that a violation of the PPPA is sufficient to confer Article III standing.

*See Lin v. Crain Commc'ns Inc.*, No. 19-11889, 2020 WL 248445, at *6 (E.D. Mich.

Jan. 16, 2020) ("The alleged violation of Michigan's PPPA implicates [plaintiff's]

'concrete interest' in the disclosure of his PRI without permission.") (citing cases).

It is true that courts have recognized that claims under the PPPA typically

involve a sufficiently concrete injury for purposes of Article III.  *See e.g.*, *Coulter-

Owens v. Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017) (explaining that

disclosure of private reading information is not a bare procedural violation, but is

"a violation of the [Act's] most basic substantive protection" and collecting cases);

*Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 641 (E.D. Mich. 2017) (explaining that the

right to nondisclosure of private reading information is "similar in kind to other

privacy rights that were gradually recognized by American courts over the course

of the last century[.]"); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D.

Mich. 2017) ("Subscribers' right to privacy in their personal-reading information is

grounded in an interest traditionally regarded as providing a basis for a lawsuit in

English or American courts.") (citation and internal marks omitted).  However, as

held in *Crane v. American Bar Ass'n*, --- F. Supp. 3d ---; 2023 WL 2603191, at *3

(E.D. Mich. 2023) (Berg, J.), where a plaintiff himself has already published all the

information he claims would cause him injury if disclosed, there is no Article III

standing.  In *Crane*, the court rejected the plaintiff's claim that he had standing

despite his own disclosure because his injury was his right to control the

dissemination of information.  *Id*.  The court noted that a person may retain a

privacy interest in information that is public in some other form because "both

the common law and the literal understandings of privacy encompass the

individual's *control* of information concerning his or her person."  *Id*. at *3

(quoting *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749,

763 (1989) (emphasis added in *Crane*)).  Yet, the court also acknowledged that

"there is a point at which information is no longer subject to any privacy interest

at all."  *Id*. (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494–495 (1975)

("[T]he interests in privacy fade when the information involved already appears

on the public record"); *Reporters Committee*, 489 U.S. at 763–64 ("[I]nformation

may be classified as private if it is intended for or restricted to the use of a

particular person or group or class of persons: not freely available to the public.")

(internal marks and citation omitted, emphasis added).

  In *Crane*, the plaintiff claimed that his PRI was disclosed by the defendant.

More specifically, he claimed that the fact that he was a member of the American

Bar Association (ABA), and therefore a subscriber to the ABA Journal, was

disclosed by the ABA.  *Id*. at *4.  However, the plaintiff had "already disclosed that

information himself on two well-trafficked websites: his law firm's and that of the

State Bar of Michigan."  *Id*.  The court rejected the argument that the disclosure

of his ABA membership status was for the benefits of clients and prospective

clients and does not equate to consent to the ABA's rental and sale of his PRI.  *Id*.

In doing so, the court held:

> As the common law principles outlined above show,
> Crane's right to privacy does include some right to
> control the distribution of information about himself.
> *But the record shows that Crane exercised that control
> and published to the entire world the very facts he claims
> the ABA revealed*. Crane cannot now be heard to
> complain that he was injured by the ABA's re-publication
> of what Crane then revealed and continues to reveal
> now—that claimed harm does not resemble any of the
> common law privacy torts discussed above.

*Id*. (emphasis added).  The court found that the PRI did not fall into the category

of "public yet otherwise hard-to-obtain information" about a person's reading

habits, which might implicate a privacy interest.  *Id*. at *4 (citation and quotation

marks omitted).  Instead, the PRI was made "freely available to the public" before

any disclosure by the ABA and thus, "the common law would not recognize an

invasion-of privacy claim for giving additional publicity to something a person has

already made public."  *Id*. (citing *Reporters Committee*, 489 U.S. at 763-64).

Accordingly, while the ABA may have violated the PPPA, the injury was found not sufficiently concrete to confer Article III standing.  *Id*. at *5.

The facts here are distinguishable from those in *Crane*.  NAR explains that NAR members may claim and edit their realtor.com profiles and Murray did so here.  (ECF No. 31-1, ¶¶ 16-17).  NAR records show that Murray edited his biography on his realtor.com profile, which displays the REALTOR® mark and his NAR membership.  *Id*. at ¶¶ 17, 20.  The REALTOR® mark is also displayed on Murray's LinkedIn profile page.  (ECF No. 31-1, PageID.2536).  Murray does not dispute that he made these disclosures.  (ECF No. 33, PageID.2578).  But is Murray's public disclosure of his NAR membership the same as a public disclosure of his PRI (his subscription to the NAR magazine)?  In *Crane*, the plaintiff's complaint "appears to be premised on the notion that disclosure of his ABA membership is equivalent to disclosure of the fact that he subscribes to the ABA Journal."  *Crane*, at *1, n. 1.  *Crane* is distinguishable from the present circumstances because the defendant there advertised and sold the ABA membership list, which is the same information that the plaintiff publicly disclosed.  Here, according to the SAC, NAR sold the REALTOR® magazine subscription list, not a NAR organization membership list and those two things do not appear to be equivalent.  This is so, according to the SAC, because members

of the NAR can opt out of receiving the magazine and non-NAR members can purchase subscriptions.  Thus, a voluntary disclosure of membership does not equate to a voluntary disclosure of the magazine subscription.  The court finds that *Crane* is not applicable, and Murray has Article III standing under *Coulter-Owens*, 695 F. App'x at 121 ("The disclosure of [PRI] is a cognizable injury in fact for purposes of Article III standing.")

  C. <u>Statutory Standing</u>

  NAR also argues that Murray lacks *Article III* standing because the only alleged injury in fact under the PPPA is an invasion of privacy in one's reading choices, and he has not suffered any such injury.  The SAC alleges that Murray purchased his subscription to REALTOR® magazine directly from NAR at the price of $6.00," and NAR members allegedly "subscribe as part of their $6.00 membership."  (ECF No. 30, ¶¶ 11, 48).  NAR's argument is that, contrary to the allegations in the SAC, Murray did not purchase a subscription to REALTOR® magazine and it was instead included as part of his membership dues; accordingly, he cannot establish the privacy injury protected by the PPPA.  *See* ECF No. 30-6, BPA Worldwide, Brand Report for REALTOR® Magazine, ("Members' yearly subscription price is included in the dues and is non-deductible therefrom."); *see also* ECF No. 31-1, Doyle Decl. ¶¶ 5-6 ("All NAR members

receive REALTOR® Magazine by mail as part of their membership unless they

affirmatively opt out of receiving it.  NAR does not sell REALTOR® Magazine

subscriptions to its members.  NAR members who opt out of receiving REALTOR®

Magazine are not refunded any portion of their membership dues.").  Thus, NAR

argues that Murray did not "purchase his subscription" to REALTOR® Magazine; it

was a free (and non- deductible) membership benefit.  *See Lin v. Crain Commc'ns*

*Inc*., No. 19-cv-11889, 2020 WL 248445 (E.D. Mich. Jan. 16, 2020).

NAR's argument is not one of Article III standing, which relates to subject

matter jurisdiction, as it complains that the SAC does not meet the *statutory*

*requirements* of the PPPA.  Instead, this argument is one of statutory standing.

The question of statutory standing is "analytically distinct from the question of

whether a federal court has subject-matter jurisdiction to decide the merits of a

case."  *Short v. Janssen Pharms., Inc.*, No. 1:14-CV-1025, 2015 WL 2201713, at *3

(W.D. Mich. May 11, 2015) (quoting *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir.

2011)).  Where a plaintiff lacks statutory standing to sue, the court must dismiss

his case for failure to state a claim upon which relief can be granted.  *Hamer*, 655

F.3d at 581.  Accordingly, the court cannot consider NAR's proffered declaration

in support of its statutory standing argument.  *See Kostrzewa v. City of Troy*, 247

F.3d 633, 643 (6th Cir. 2001) ("The district court, in reviewing a motion to dismiss,

may not consider matters beyond the complaint.").  Taking the allegations in the
SAC as true, as the court must, the allegations satisfy the PPPA because Murray
alleges that he purchased his subscription to REALTOR® magazine directly from
NAR at the price of $6.00, and NAR members "subscribe as part of their $6.00
membership."  (ECF No. 30, ¶¶ 11, 48).  The court declines NAR's invitation to
interpret the language on the Brand Report -- "Members' yearly subscription
price is included in the dues and is non-deductible therefrom" – as definitively
establishing Murray cannot satisfy the PPPA's requirement that the reading
material at issue was purchased under Mich. Comp. Laws § 445.1711(a).  This
argument is an attempt to hold Murray to an inapplicable evidentiary standard at
the pleading stage.  The court cannot, and need not, in the context of this motion
to dismiss, determine the accuracy and meaning of this phrase.  *See United States
v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (In
assessing the sufficiency of a complaint, the court must determine only whether
"'the claimant is entitled to offer evidence to support the claims,' not whether the
plaintiff can ultimately prove the facts alleged.") (quoting *Swierkiewicz v. Sorema
N.A.*, 534 U.S. 506, 511 (2002)).  Accordingly, the court denies the motion to
dismiss on this basis.

D.     Was NAR "engaged in the business of selling at retail"?

NAR argues that the court should dismiss the SAC for failure to sufficiently

plead facts demonstrating that NAR is "engaged in the business of selling at retail,

renting, or lending books or other written materials[.]"  Mich. Comp. Laws

§ 445.1712.  The SAC alleges that "Plaintiff purchased his subscription to *Realtor*

magazine directly from NAR at the price of $6.00" and that "non-members may

pay $56.00 for a subscription."  (ECF No. 30, ¶¶ 11, 48).  According to NAR, these

allegations fall far short of pleading that NAR is "engaged in the business of

selling" REALTOR® Magazine "at retail," and also contradict the Brand Report.

According to NAR, the Brand Report shows that NAR is not engaged in the

business of selling magazines at retail because it indicates that "100.0" percent of

the magazines circulated were provided as a "Membership Benefit" to NAR's

members and that the $6 subscription "price" was "included in the dues and is

non-deductible therefrom."  (ECF No, 30-6, Brand Report).  This means, according

to NAR, that it did not sell a magazine to any member.  NAR also argues that the

allegation concerning the non-member subscription price also fails to establish

that NAR is "engaged in the business" of selling written materials at retail because

Murray does not allege that he, or anyone else, purchased a magazine

subscription from NAR for the non-member subscription price.

In response, Murray claims that he has sufficiently alleged that NAR is engaged in the business of selling magazines at retail.  More specially, the SAC alleges that NAR "is the publisher of REALTOR®." (ECF No. 30, ¶ 12).  Further, as "a magazine publisher that sells subscriptions to consumers, NAR is engaged in the business of selling written materials at retail."  *Id*. ¶ 59.  The SAC also alleges that "Plaintiff purchased his subscription to REALTOR® magazine directly from NAR at the price of $6.00."  *Id*. at ¶ 11.  Finally, the SAC alleges that NAR sells its magazine to non-members for $56.00 per year.  *Id*. at ¶ 48.  While NAR argues that it "did not sell a magazine to any member," Murray points out that the Brand Report for REALTOR® magazine indicates that for the six-month periods of January-June 2016 and July-December 2016 there were 1,143,079 and 1,197,251, respectively, paid subscriptions to REALTOR® magazine, each of which was sold by Defendant to an NAR member at the price of "$6.00."  *Id.* at ¶ 11, citing ECF No. 30-6, Brand Report.

Both parties point to *Coulter-Owens'* discussion of the meaning of "at retail" in support of their arguments.  There, the plaintiff purchased her subscription from a subscription agent, not directly from the publisher.  695 F. App'x at 122.  The court explained that there were two sales: the publisher's sale to the subscription agent and the subscription agent's sale to the plaintiff.  *Id*. at

124.  Because the plaintiff was the end consumer, the sale to her by the

subscription agent was necessarily "at retail;" but the sale from publisher to the

subscription agent was not "at retail."  *Id*.  NAR argues that because the magazine

subscription price was included in the membership cost, it could not have been

engaged in the selling of magazines at retail.  Here, the SAC is clear that the sale

was between the publisher (NAR) and the end consumer (Murray) and thus, falls

in category of an "at retail" sale, per *Coulter-Owens*.  NAR does not make the case

that because the sale accompanied the purchase of a NAR membership, it is

exempt from the scope of a sale "at retail."  NAR does not provide any authority

suggesting that sales to members of an organization cannot, as a matter of law,

constitute sales "at retail" or that an entity that sells only to its members cannot,

as a matter of law, be "engaged in the business of" selling written materials "at

retail."  Absent more definitive authority, the court is not inclined to dismiss the

SAC on this basis.

E.    Statute of Limitations

NAR essentially argues that whether the three- or six-year limitations

period applies, Murray fails to plead that his claim is timely.[1]  That is, NAR argues

---

[1] To the extent NAR's motion could be construed as arguing that the three-year
limitations period found in Mich. Comp. Laws § 600.5805(2) should apply, the court rejects that

that Murray's claims are not timely unless his PRI was disclosed within six years of

when he brought his claim.  Murray filed the original Complaint on May 20, 2022,

and a claim for any alleged disclosure before May 20, 2016 is time-barred.  NAR

argues that the SAC does not plead when it allegedly disclosed Murray's

identifying purchase records, or that such a disclosure occurred between May 20

and July 30, 2016.  Instead, the SAC only refers to the "relevant pre-July 2016 time

period," without any specificity.  Because there is no allegation in the SAC that

Murray's PRI was disclosed from May 30, 2016 to July 30, 2016, NAR maintains

that the PPPA claim fails, even assuming a six-year limitations period.

As the Sixth Circuit has admonished, "a motion under Rule 12(b)(6), which

considers only the allegations in the complaint, is generally an inappropriate

vehicle for dismissing a claim based upon the statute of limitations," unless "the

allegations in the complaint affirmatively show that the claim is time-barred."

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).  Accordingly, Murray

is not required to affirmatively plead compliance with the statute of limitations.

---

claim for the same reasons it rejected this argument in *Gaines v. Nat'l Wildlife Fed'n*, No. 22-11173, 2023 WL 3186284, at *6-7 (E.D. Mich. May 1, 2023) and *Russett v. NTVB Media, Inc.*, No. 22-10352, 2023 WL 6315998, at *5 (E.D. Mich. Sept. 28, 2023).  NAR offers no basis for the court to revisit its conclusion in *Gaines* and *Russett* that the six-year limitations period found in § 600.5815 applies to PPPA claims.

Thus, there is no requirement for Murray to identify in the complaint the precise date his own PRI was disclosed.

Additionally, the SAC does not affirmatively show that Murray's claims are time barred, where the six-year limitations period applies, as the court concludes, *infra*.  In the SAC, Murray alleges that the "relevant pre-July 31, 2016 time period" is the period that begins on the earliest possible date of an actionable statutory violation (six years prior to the case's filing) pursuant to the governing six-year statutory period set forth in Mich. Comp. Laws § 600.5813 (which the Governor of Michigan tolled for 101 days during the COVID-19 pandemic), and ends on July 30, 2016 (the last date on which the version of the statute invoked in this case existed prior to the effective date of its amendment).  *See* ECF No. 30, ¶ 1 n.1 (stating that "[t]he statutory period for this action is six years," and citing Mich. Comp. Laws § 600.5813); *id*. ¶ 1 n.2 ("Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.").  Thus, according to the SAC, the relevant period is from February 20, 2016 through July 30, 2016.  Even using NAR's more limited time frame of May 30, 2016 to July 30, 2016, the SAC does not suggest, on its face, that its allegations of wrongful

disclosure of PRI fall outside the six-year limitations period.  Accordingly, dismissal on this basis is unwarranted.

## IV.    CONCLUSION

For the reasons set forth above, the court **DENIES** Defendant NAR's motion to dismiss the Second Amended Complaint.

**SO ORDERED**.

Date: November 15, 2023                    s/F. Kay Behm
                                                         F. Kay Behm
                                                         United States District Judge