## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSHUA MURRAY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS,<br><br>Defendant. | Case No. 4:22-cv-11107-FKB-DRG<br><br>HON. F. KAY BEHM<br>Magistrate Judge David R. Grand<br><br>**DEFENDANT NATIONAL ASSOCIATION OF REALTORS®' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT** |

Defendant National Association of REALTORS® ("NAR") hereby answers Plaintiff's Second Amended Complaint ("SAC").

NAR denies the allegations and characterizations in the SAC unless expressly admitted in the following paragraphs. The numbered paragraphs of this Answer correspond to the numbered paragraphs in the SAC, other than with respect to the affirmative defenses and jury demand set forth herein, and the Prayer for Relief. In responding to the SAC, NAR has kept Plaintiff's headings for ease of reference, but in so doing, NAR is not admitting to the accuracy of any statements made or agreeing with any characterizations made in such headings.

## INTRODUCTION

1.     Defendant National Association of Realtors ("NAR") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *Realtor* magazine subscription to data aggregators, data appenders, data cooperatives, and

list brokers, among others, which in turn disclosed his information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information (defined below) during the relevant pre-July 30, 2016 time period[1], NAR violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

**ANSWER: The allegations in Paragraph 1 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 1, including all legal conclusions in the footnotes. For the law and cases cited in the footnotes, NAR refers to the cited documents for**

---

[1] The statutory period for this action is six years. See M.C.L. § 600.5813.

[2] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

their actual and complete contents and denies any allegations or characterizations inconsistent therewith.

2.      Documented evidence confirms these facts. For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "*Realtor* magazine Mailing List", which contains the Private Reading Information of all 1,413,832 of NAR's active U.S. subscribers to *Realtor* magazine at a base price of "$120.00/M [per thousand]," (i.e., 12 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto. The same or a substantially similar "data card" as the one shown above, with the same or similar rates and advertised demographic and

personal information about each U.S. based subscriber as listed above, was also publicly advertised by NAR as far back as the beginning of 2015 and for the entire duration of the pre-July 31, 2016 time period – thus demonstrating that NAR was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.

**ANSWER: The allegations in Paragraph 2 contain legal conclusions to which no response is required. To the extent a response is required, NAR refers to the cited documents, to the extent they actually exist, for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations in Paragraph 2.**

3.     As a result of NAR's practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox over the same time period.

**ANSWER: Denied.**

4.     By renting, exchanging, or otherwise disclosing the Private Reading Information of its Michigan-based subscribers during the relevant pre-July 30, 2016 time period, NAR violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials... shall not disclose to any person, other than the customer, a record

or information concerning the purchase... of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

**ANSWER: The allegations in Paragraph 4 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 4.**

5.      Accordingly, Plaintiff brings this Second Amended Class Action Complaint against NAR for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

**ANSWER: The allegations in Paragraph 5 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 5. NAR specifically denies that Plaintiff or any putative class member has any claim against NAR and denies any other allegations and characterizations in Paragraph 5.**

## NATURE OF THE CASE

6.      To supplement its revenues, NAR rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, and income—to data aggregators,

data appenders, data cooperatives, and other third parties without the written consent of its customers. NAR continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) throughout the relevant pre-July 31, 2016 time period.

**ANSWER: Denied.**

7.     Indeed, during the relevant pre-July 31, 2016 time period, NAR admitted on the "additional marketing" page of its *Realtor* magazine website that it was actively renting its entire subscriber database to third parties. *See* **Exhibit B** hereto (archive.org cached copy of "additional marketing" webpage from NAR's *Realtor* magazine website, dated March 21, 2016 and accessible at https://web.archive.org/web/20160321173133/http://mediakits.theygsgroup.com/nar-2016/additional-marketing, stating under the heading "Direct Mail List": "Reach out to our 1 million real estate professionals through our subscriber list. Subscriber names and addresses are rented on a per usage basis. Markets can be separated geographically or demographically. Contact Danny Grubert, danny.grubert@lakegroupmedia.com or (914) 925-2449 at Lake Group Media for more information."); *see also* **Exhibit C** hereto (same statement under the "Direct Mail List" heading on cached copy of "custom opportunities" webpage of NAR's *Realtor* magazine website dated December 22, 2017, accessible at

https://web.archive.org/web/20171222135500/http://mediakits.theygsgroup.com:8 0/nar/additional-marketing). Still today, NAR admits on the current version of the same webpage (now called the "other opportunities" page) to engaging in the same long-standing practices of renting and otherwise disclosing its entire subscriber database to third parties. *See* **Exhibit D** hereto (stating under the heading "Direct Mail List" on the "other opportunities" webpage of *Realtor* magazine website dated October 11, 2022 (accessible at https://mediakits.theygsgroup.com/nar/advertising-opportunities/other-opportunities): "Reach out to our 1.5+ million real estate professionals through our subscriber list. Subscriber names and addresses are rented on a per usage basis. Markets can be separated geographically or demographically. Contact Lenny Medico, lenny.medico@lakegroupmedia.com or (914) 925-2465 at Lake Group Media for more information.").

**ANSWER**: **NAR refers to the cited documents for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations in Paragraph 7.**

8.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, NAR is able to disclose the information time and time again to countless third parties.

**ANSWER**: **Denied.**

9.     NAR's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

**ANSWER: The allegations in Paragraph 9 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 9.**

10.     While NAR profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because NAR does not obtain its customers' written consent prior to disclosing their Private Reading Information.

**ANSWER: The allegations in Paragraph 10 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 10.**

## PARTIES

11.     Plaintiff Joshua Murray is a natural person and citizen of the State of Michigan and resides in South Lyon, Michigan.  Plaintiff was a subscriber to *Realtor* magazine, including during the relevant pre-July 30, 2016 time period. *Realtor* magazine is published by NAR. While residing in, a citizen of, and present in Michigan, Plaintiff purchased his subscription to *Realtor* magazine directly from

NAR at the price of $6.00. *See* **Exhibit E** hereto, at 3-4 (BPA Worldwide "Brand Report" for *Realtor* magazine "for the 6 month period ended December 2018," in which NAR stated, under oath, in connection with an audit into the annual subscribership for *Realtor* magazine, that for the six-month periods of January-June 2016 and July-December 2016 there were 1,143,079 and 1,197,251, respectively, paid subscriptions to *Realtor* magazine, each of which was purchased by an NAR member at the price of "$6.00," which was "included in the dues" for NAR membership). Prior to and at the time Plaintiff subscribed to *Realtor*, NAR did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized NAR to do so. Furthermore, Plaintiff was never provided any written notice that NAR rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since subscribing to *Realtor*, and during the relevant pre-July 30, 2016 time period, NAR disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, NAR rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact NAR subscribers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER:** **NAR lacks sufficient knowledge or information to admit or deny the allegations in the first sentence of Paragraph 11 and therefore denies them. NAR admits that it publishes REALTOR® Magazine, which all NAR members receive at no cost, as a free membership benefit. NAR denies that Plaintiff was a subscriber to REALTOR® Magazine, as defined by the PPPA, prior to July 31, 2016. NAR denies all other allegations in Paragraph 11, many of which state legal conclusions to which no response is required. NAR further incorporates herein by reference the Declaration of Colleen Doyle, dated February 22, 2023, ECF No. 31-1, PageID.2530, attached as Exhibit 1 hereto.**

12.     Defendant National Association of Realtors is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois. NAR does business throughout Michigan and the entire United States. NAR is the publisher of *Realtor*.

**ANSWER:** **NAR admits that it is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois and that it publishes REALTOR® Magazine. NAR denies it does sufficient business in Michigan that would subject it to any Michigan court's personal jurisdiction, but it has not challenged venue or the Court's personal jurisdiction in the context of this case.**

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

**ANSWER: The allegations in Paragraph 13 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies that Plaintiff's claim satisfies the requirements of 28 U.S.C. § 1332(d), denies that this action should be certified as a class action, and denies any remaining allegations in Paragraph 13.**

14.     The Court has personal jurisdiction over NAR because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Realtor* subscription in Michigan, NAR's direction of such *Realtor* subscription into Michigan, and NAR's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over NAR in Michigan because NAR conducts substantial business within Michigan, such that NAR has significant, continuous, and pervasive contacts with the State of Michigan.

**ANSWER: The allegations in Paragraph 14 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies it has sufficient contacts with Michigan to subject it to any Michigan court's personal jurisdiction, but it has not challenged the Court's personal jurisdiction in the context of this case.**

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, NAR does substantial business in this judicial District, NAR is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

**ANSWER: The allegations in Paragraph 15 contain legal conclusions, to which no response is required. To the extent a response is required, NAR denies it does sufficient business in Michigan that would subject it to any Michigan court's personal jurisdiction or venue, but it has not challenged personal jurisdiction or venue in the context of this case.**

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER**: **NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations in Paragraph 16.**

17.   Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

**ANSWER**: **Paragraph 17 refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 17.**

18.   Subsection 2 of the PPPA states:

> "[A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials... *shall not disclose* to any person, other than the customer, a record or information concerning the purchase... of those materials by a customer that indicates the identity of the customer."

PPPA § 2 (emphasis added).

**ANSWER: NAR admits that the allegations contained in Paragraph 18 contain an excerpt from a section of the PPPA, but denies that it is the complete text of the statute. NAR denies any remaining allegations contained in Paragraph 18.**

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

**ANSWER: NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 19.**

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

**ANSWER**: **NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 20**.

21.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities... reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

**ANSWER**: **NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 21**.

22.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit F**).

**ANSWER**: **NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 22**.

23.    Despite the fact that thousands of Michigan residents subscribe to NAR's publications, NAR disregarded its legal responsibility by systematically violating the PPPA.

**ANSWER: Denied.**

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

24.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution... has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes... [and] individuals are concerned about being defined by the existing data on themselves."[3]

**ANSWER: NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 24**.

---

[3] **Exhibit G**, The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public__events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

25.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

**ANSWER: NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR denies any remaining allegations contained in Paragraph 25**.

26.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

**ANSWER: NAR refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth**

---

[4] *See* **Exhibit H**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[5] **Exhibit I**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_state ments/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

**of any remaining allegations contained in Paragraph 26 and denies them on that basis**.

27.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

**ANSWER: NAR refers to the cited document in the footnote accompanying Paragraph 27 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 27 and denies them on that basis.**

28.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

---

[6] *See* **Exhibit J**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows - what-youre-doing-right-now/ (last visited July 30, 2021).

[7] **Exhibit K**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/ eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

**ANSWER**: **NAR refers to the cited document in the footnote to Paragraph 28 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 28 and denies them on that basis.**

29.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

**ANSWER**: **NAR refers to the cited document in the footnote to Paragraph 29 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 29 and denies them on that basis.**

30.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking

---

[8] **Exhibit L**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

information on how those companies collect, store, and sell their massive collections of consumer data.[9]

**ANSWER: NAR refers to the cited document in the footnote to Paragraph 30 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 30 and denies them on that basis**.

31.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

**ANSWER: NAR refers to the cited document in the footnote to Paragraph 31 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information**

---

[9] *See* **Exhibit M**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[10] *Id*.

**sufficient to form a belief as to the truth the allegations contained in Paragraph 31 and denies them on that basis.**

32. Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like NAR share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

**ANSWER: NAR denies the allegations contained in Paragraph 32 regarding NAR's alleged actions and the effect of such actions. NAR refers to the cited documents in the footnotes accompanying Paragraph 32 for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge and information sufficient to form a belief as**

---

[11] *See* **Exhibit N**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[12] **Exhibit O**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

to the truth of any remaining allegations contained in Paragraph 32 and denies them on that basis.

33.     Information disclosures like those made by NAR are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

**ANSWER: NAR denies the allegations contained in the first sentence of Paragraph 33. NAR refers to the cited documents in the footnotes accompanying Paragraph 33 for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks**

---

[13] *Id.*

[14] Exhibit P, Fraud Against Seniors: Hearing before the Senate Special Committee on Aging (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

**knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 33 and denies them on that basis.**

34.     Thus, information disclosures like NAR's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

**ANSWER: NAR denies the allegations contained in Paragraph 34 regarding NAR's alleged actions and the effect of such actions. NAR refers to the cited document in the footnote accompanying Paragraph 34 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 24 and denies them on that basis.**

35.     NAR is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[15] *See id.*

**ANSWER: NAR denies the allegations contained in Paragraph 35 regarding NAR's alleged actions. NAR lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 34 concerning the actions of other entities and denies them on that basis.**

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

**ANSWER: NAR lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and denies them on that basis.**

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

**ANSWER: NAR lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and denies them on that basis.**

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business

with companies who they believe do not protect their privacy online.[16] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

**ANSWER**: **NAR refers to the cited document in the footnotes accompanying Paragraph 38 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38 and denies them on that basis.**

39.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

**ANSWER**: **NAR lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and denies them on that basis.**

---

[16] *See* **Exhibit Q**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfid enceReport_US1.pdf (last visited July 30, 2021).

[17] *Id*.

40.    In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

**ANSWER: NAR lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and denies them on that basis.**

41.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

**ANSWER: NAR refers to the cited document in the footnote accompanying Paragraph 41 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information**

---

[18] *See* **Exhibit R**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[19] *See* **Exhibit S**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jul. 30, 2021).

sufficient to form a belief as to the truth of the allegations in Paragraph 41 and denies them on that basis.

42.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

**ANSWER: NAR refers to the cited document in the footnote accompanying Paragraph 42 for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NAR lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and denies them on that basis.**

### *NAR Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading Information*

43.     NAR maintains a vast digital database comprised of its customers' Private Reading Information. NAR discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each NAR customer, including his or her age, gender, and income. (*See, e.g.*, **Exhibit A**).

**ANSWER:  Denied.**

---

[20] *See* **Exhibit T**, Hann, *et al., The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu /viewdoc/download?doi=10.1.1.321.6125&rep=rep1&ty pe=pdf (last visited Jul. 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

44.    NAR then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

**ANSWER: Denied.**

45.    NAR also discloses its customers' Private Reading Information to data cooperatives, who in turn give NAR access to their own mailing list databases.

**ANSWER: Denied.**

46.    As a result of NAR's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from NAR that identify NAR's customers by their most intimate details such as their age, gender, and income. NAR's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

**ANSWER: Denied.**

47.    NAR does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private

Reading Information and other sensitive information is being rented and exchanged on the open market.

**ANSWER**: **Denied.**

48.     Consumers can sign up for subscriptions to NAR's publications through numerous media outlets, including the Internet, telephone, or traditional mail. As aforementioned, NAR members subscribe as a part of their $6.00 membership.[21] And non-members may pay $56.00 for a subscription.[22] Regardless of how the consumer subscribes, NAR never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NAR uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

**ANSWER**: **NAR admits that nonmembers can purchase REALTOR® Magazine.  NAR denies the remaining allegations contained in Paragraph 48.**

---

[21] *See* **Exhibit E**.

[22] **Exhibit U**, *See* "Realtor magazine Services" page of NAR's website, accessed Jan. 17, 2023, accessible at https://www.nar.realtor/magazine/services ("Nonmember subscriptions, U.S. only: $56").

49.     As a result, NAR disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[23] – to anybody willing to pay for it.

**ANSWER: Denied.**

50.     By and through these actions, NAR has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

**ANSWER: Denied.**

## CLASS ACTION ALLEGATIONS

51.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 30, 2016 time period, had their Private Reading Information disclosed to third parties by NAR without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

**ANSWER: NAR admits that Plaintiff seeks to bring this action as a class action on behalf of a putative class, but denies that any class can be certified in this**

---

[23] **Exhibit V**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

**case. The remaining allegations in Paragraph 51 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 51.**

52.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

**<u>ANSWER</u>: The allegations in Paragraph 52 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 52.**

53.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether NAR is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether NAR obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading Information; and (c) whether NAR's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

**ANSWER:** **The allegations in Paragraph 53 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 53.**

54.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

**ANSWER:** **The allegations in Paragraph 54 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 54.**

55.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

**ANSWER:** **The allegations in Paragraph 55 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 55.**

56.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER: The allegations in Paragraph 56 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 56 and denies that any class can be certified under Rule 23.**

## CAUSE OF ACTION

### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

57.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER: NAR incorporates its responses to Paragraphs 1-56 as if fully set forth herein.**

58.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant NAR.

**ANSWER: NAR admits that Plaintiff purports to bring this claim individually and as a putative class action against NAR, but denies that any individual or class-wide relief is appropriate.**

59.     As a magazine publisher that sells subscriptions to consumers, NAR is engaged in the business of selling written materials at retail. *See* PPPA § 2.

**ANSWER: NAR refers to the PPPA for its complete contents and denies any allegations or characterizations inconsistent therewith. The allegations in Paragraph 59 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 59.**

60.     By purchasing a subscription to *Realtor* magazine, Plaintiff purchased written materials directly from NAR. *See* PPPA § 2.

**ANSWER: NAR refers to the PPPA for its complete contents and denies any allegations or characterizations inconsistent therewith. The allegations in Paragraph 60 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 60.**

61.    Because Plaintiff purchased written materials directly from NAR, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

**ANSWER: NAR refers to the PPPA for its complete contents and denies any allegations or characterizations inconsistent therewith. The allegations in Paragraph 61 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 61.**

62.    At various times during the pre-July 30, 2016 time period, NAR disclosed Plaintiff's Private Reading Information, which identified him as a *Realtor* customer, in at least three ways.

**ANSWER: The allegations in Paragraph 62 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 62.**

63.    First, NAR disclosed mailing lists containing Plaintiff's Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NAR.

**ANSWER: The allegations in Paragraph 63 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 63.**

64.    Second, NAR disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave NAR access to their own mailing list databases.

**ANSWER: The allegations in Paragraph 64 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 64.**

65.    Third, NAR rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

**ANSWER:  The allegations in Paragraph 65 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 65.**

66.    Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and NAR was able to increase its profits gained from the mailing list rentals and/or exchanges.

**ANSWER**: **Denied.**

67.    By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 30, 2016 time period, NAR disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from NAR. *See* PPPA § 2.

**ANSWER**: **NAR refers to the PPPA for its complete contents and denies any allegations or characterizations in Paragraph 67 inconsistent therewith. The allegations in Paragraph 67 contain legal conclusions, to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 67.**

68.    The information NAR disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed to *Realtor*. Accordingly, the records or information disclosed by NAR indicated Plaintiff's identity. *See* PPPA § 2.

**ANSWER**: **NAR refers to the PPPA for its complete contents and denies any allegations or characterizations in Paragraph 68 inconsistent therewith. The allegations in Paragraph 68 contain legal conclusions, to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 68.**

69.    Plaintiff and the members of the Class never consented to NAR disclosing their Private Reading Information to anyone.

**ANSWER**: **The allegations in Paragraph 69 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 69.**

70.    Worse yet, Plaintiff and the members of the Class did not receive notice before NAR disclosed their Private Reading Information to third parties.

**ANSWER**: **The allegations in Paragraph 70 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 70.**

71.    NAR's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

**ANSWER**: **The allegations in Paragraph 71 contain legal conclusions to which no response is required. To the extent a response is required, NAR states that the SAC's allegations do not appear to relate to disclosures pursuant to a court order, search warrant, or grand jury subpoena. NAR denies that it has disclosed information in violation of the PPPA, and denies any remaining allegations in Paragraph 71.**

72.    NAR's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period were not made to collect payment for their subscriptions.

**ANSWER: The allegations in Paragraph 72 contain legal conclusions to which no response is required. To the extent a response is required, NAR states that the allegations in the SAC do not pertain to disclosures made to collect payments for subscriptions. NAR denies that it has disclosed information in violation of the PPPA, and denies any remaining allegations in Paragraph 72.**

73.     NAR's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 30, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase NAR's revenue. Accordingly, NAR's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

**ANSWER:  The allegations in Paragraph 73 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 73.**

74.     By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 30, 2016 time period, NAR violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

**ANSWER: NAR refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 74 that are inconsistent therewith. The allegations in Paragraph 74 contain legal conclusions to which**

**no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 74.**

75.     As a result of NAR's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

**ANSWER: NAR refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 75 that are inconsistent therewith. The allegations in Paragraph 75 contain legal conclusions to which no response is required. To the extent a response is required, NAR denies the allegations in Paragraph 75.**

## PRAYER FOR RELIEF

To the extent a response is required, NAR denies that Plaintiff or any putative class members have suffered any harm or damage of any kind as a result of NAR's alleged conduct.  NAR further denies that Plaintiff or any putative class members are entitled to the relief sought or any other relief.

## AFFIRMATIVE DEFENSES

NAR asserts the following affirmative and other defenses to the SAC. NAR asserts these affirmative defenses without assuming any further burden of proof for

such defenses. NAR does not knowingly or intentionally waive any applicable affirmative defense and specifically reserves the right to supplement or amend these affirmative defenses as discovery is conducted. Finally, NAR repeats, re-alleges, and incorporates by reference herein each and every response to every paragraph above and below as if fully set forth in each of the affirmative defenses below.

### FIRST DEFENSE

Plaintiff's and/or other putative class members' information was not disclosed in violation of the PPPA.

### SECOND DEFENSE

Plaintiff and/or other putative class members have not been harmed, have incurred no cognizable damages, and have not suffered an injury-in-fact traceable to NAR and, therefore, lack standing.

### THIRD DEFENSE

Plaintiff and/or putative class members provided written permission for the complained of disclosures pursuant to M.C.L. § 455.1713.

### FOURTH DEFENSE

Any alleged disclosures of Plaintiff's or any putative class members' information fall within the PPPA's marketing exception contained in M.C.L. § 455.1713.

## FIFTH DEFENSE

The PPPA does not apply to the alleged disclosures because Plaintiff's and/or putative class members' magazine subscriptions were not sold or purchased "at retail" pursuant to M.C.L. § 455.1712.

## SIXTH DEFENSE

Any alleged disclosures of Plaintiff's or any putative class members' information were and are permissible under the PPPA. M.C.L. § 455.1712.

## SEVENTH DEFENSE

To the extent Plaintiff and/or other putative class members voluntarily disclosed their Private Reading Information and/or consented to the disclosure of such information, their claims are barred in whole or in part by the doctrines of consent, waiver, laches, estoppel, unclean hands, and/or other equitable doctrines,

## EIGHTH DEFENSE

Plaintiff's and/or other putative class members' claims are barred, in whole or in part, by the applicable statute of limitations and/or statute of repose.

## NINTH DEFENSE

Plaintiff and/or putative class members have failed to state a claim upon which relief can be granted under the PPPA.

## TENTH DEFENSE

Plaintiff's claim for alleged statutory damages without proof of any actual

damages is unconstitutionally excessive and barred by the Fifth and/or Eighth Amendments to the United States Constitution and Article I, Section 16 and 17 of the Michigan Constitution, and violates substantive and procedural due process.

## ELEVENTH DEFENSE

Plaintiff and/or other alleged class members lack statutory standing under the PPPA to assert the claims in the SAC and to seek some and/or all of the relief requested.

## TWELFTH DEFENSE

Both on its face and as applied by Plaintiff's claim, the PPPA is unconstitutional under the First Amendment to the United States Constitution and Article I, Section 5 of the Michigan Constitution.

## THIRTEENTH DEFENSE

Awarding aggregated damages to a class would violate NAR's right to due process of law under the United States Constitution because the Michigan State Legislature did not authorize the collection of aggregated statutory damages through class actions. Instead, Michigan law proscribes plaintiffs from bringing class actions under the PPPA in Michigan state courts, preventing the collection of aggregated class damages.

## FOURTEENTH DEFENSE

This action cannot properly be brought as a class action because the

requirements of Federal Rule of Civil Procedure 23 for class certification are not met and cannot be met in this action.

## <u>FIFTEENTH DEFENSE</u>

This Court lacks subject-matter jurisdiction pursuant to the Class Action Fairness Act. 28 U.S.C. § 1332(d).

## <u>SIXTEENTH DEFENSE</u>

The SAC contains insufficient information to permit NAR to raise all appropriate defenses and, therefore, NAR reserves its right to amend and/or supplement its answer and these defenses to assert additional defenses.


**WHEREFORE**, NAR respectfully requests that this Court enter judgment in its favor and against Plaintiff, dismiss the SAC, award NAR its costs, and enter such other relief as this Court deems necessary and proper.

Dated:  December 13, 2023                By: */s/ Tiana Demas*
                                         Tiana Demas
                                         Philip M. Bowman
                                         COOLEY LLP
                                         55 Hudson Yards
                                         New York, NY 10001
                                         (212) 479-6000
                                         tdemas@cooley.com

                                         Khary J. Anderson
                                         COOLEY LLP
                                         1299 Pennsylvania Avenue, NW
                                         Suite 700
                                         Washington, DC 20004
                                         (202) 842-7800
                                         kjanderson@cooley.com

                                         Suzanne L. Wahl (P71364)
                                         Elise H. Yu (P79344)
                                         ARENTFOX SCHIFF LLP
                                         350 S. Main Street
                                         Suite 210
                                         Ann Arbor, MI 48104
                                         (734) 222-1517
                                         suzanne.wahl@afslaw.com
                                         elise.yu@afslaw.com

                                         *Attorneys for Defendant*
                                         *National Association of REALTORS®*